W. H. PHELAN *v.* STATE.

(*Nashville.* December Term, 1904.)'

1. **CHARGE OF COURT.** Request for further instructions containing an untrue statement as to the testimony is properly rejected.

   Request for further instructions containing a statement that a certain witness gave in testimony a certain fact or statement when, as a matter of fact, such witness did not so testify, is vicious and shoud not be charged, and its rejection is proper. (*Post, pp.* 496, 497.)

2. **EVIDENCE.** Accusations and statements denied are inadmissible.

   When an accusation or statement, made in the presence and hearing of the party, is denied, it is not admissible at all as an evidential fact, and has no probative effect whatever. (*Post, pp.* 497-507, and especially *p.* 505.)

   Cases cited and approved: Kendrick v. State, 9 Hum., 723; Deathridge v. State, 1 Sneed, 80; Low v. State, 108 Tenn., 127, 128; Commonwealth v. Kenney, 12 Metc. (Mass.), —.

3. **SAME.** Accusations and statements not denied are admissible, when.

   When an accusation or statement is made in the presence or hearing of the party, and he stands mute in the face of the charge, that fact is interpreted as a circumstance tending to show guilt, provided he heard and understood the charge, and the situation of the parties demanded a denial, all of which must be left to the determination of the jury. (*Post, pp.,* 497-507, and especially, *p.* 505.)

   Cases cited and approved: Kendrick v. State, 9 Hum., 723; Daugherty v. Marcum, 3 Head, 323; Queener v. Morrow, 1 Cold., 123, 129, 130; Green v. State, 97 Tenn., 50, 62-66.

4. **SAME. Of silent acquiescence is of a dangerous character and must be received with great caution.**

The evidence of silent acquiescence in accusations and statements, made in the presence and hearing of a party, is of a dangerous character, and must be received with great caution. (*Post, pp.* 497-507, and especially, *p.* 505.)

Cases cited and approved: Queener v. Morrow, 1 Cold., 123, 129, 130; Green v. State, 97 Tenn., 50, 62-66.

5. **CHARGE OF COURT. Refusal of request for instructions as to weight of evidence of undenied accusations and statements is reversible error, when.**

The refusal to charge a request for further instructions, properly applicable to the facts, to the effect that an accusation or statement made in the presence and hearing of the defendant, if allowed to pass unchallenged, can only be looked to as a circumstance tending to show the guilt of defendant, and, as such is entitled only to such weight as the jury might give it, in view of all the proof in the case, is prejudicial to the defendant and is reversible error. (*Post, pp.* 497-507, and especially, *p.* 506.)

Cases cited and approved: Kendrick v. State, 9 Hum., 723; Daugherty v. Marcum, 3 Head, 323; Queener v. Morrow, 1 Cold., 123, 129, 130; Green v. State, 97 Tenn., 50, 62-66.

6. **SAME. Same. Refusal of request that jury should consider whether, under all the circumstances, a denial of accusations or statements was demanded, is reversible error, when.**

Refusal to charge the request for further instructions, properly applicable to the facts, to the effect that if the statement was made in the presence of the defendant, and he failed to make any response thereto, then the jury should consider whether, under all the surrounding circumstances, considering the grief and distress of his daughter, who was the wife of the deceased, the denial of her statement was demanded, is reversible error. (*Post, pp.* 497-507, and especially, *p.* 507.)

Cases cited and approved: Queener v. Morrow, 1 Cold., 123, 129, 130; Green v. State, 97 Tenn., 50, 62-66.

Phelan v. State.

7.  **SAME.**  Refusal of request not applicable to the facts is proper.

A request for further instructions not applicable to any facts in evidence is properly refused. (*Post,  p.  506.*)

8.  **SAME. That proof of good character would strengthen the the presumption of defendant's innocence should be given, when.**

Where a defendant on trial for an offense proves a good character, the court should instruct the jury that proof of good character would strengthen the presumption of defendant's innocence; but a failure to give such instructions, in the absence of a special request therefor, is not reversible error. (*Post,  p.  507.*)

FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson County.—W. M. HART, Judge.

J. M. ANDERSON and ROBT. VAUGHN, for Phelan.

ATTORNEY-GENERAL CATES, K. T. MCCONNICO and J. H. ZARECOR, for the State.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The plaintiff in error was convicted in the criminal court of Davidson county of murder in the second degree for the killing of R. T. Townes, and his punishment fixed by the jury at confinement in the State prison for a period of ten years. He has appealed in error.

The record reveals that deceased and defendant were men over sixty years of age. The deceased Townes was the son-in-law of defendant Phelan, having married the daughter of the latter about two years before the homicide. The deceased at that time was about sixty-four years of age and the daughter of defendant only about twenty-four years of age. On account of the disparity in their ages, the defendant and probably his family objected to the marriage, but it was consummated despite their opposition. It appears, however, that all the domestic differences growing out of this union had become reconciled, so that, in January, 1904, the defendant, upon the invitation of deceased and his wife, moved his family into the home of deceased, where the two families resided up to the time of this tragedy. The deceased had owned this farm for twenty-five years prior to his marriage with defendant's daughter, but before defendant and his family came to live upon the place, the deceased had conveyed the farm to his wife, the daughter of the defendant. This conveyance was made in March, 1903, a few months prior to the institution of a damage suit against Townes by one J. B. Jones.

The defendant is shown to have been a man of excellent character, his neighbors testifying with singular unanimity to his reputation as a truthful and peaceable man. It appears that for some time after defendant took up his residence at the home of his son-in-law, the relations existing between the families were most harmonious. It is probable from this record that the en-

mity between the parties grew out of a business transaction, when some timber ties were hauled by Jim Phelan, son of defendant, from the place to the city of Nashville to be sold, and in dividing the proceeds of the sale, the parties differed in their respective calculations. It turned out that the calculation made by deceased was correct, whereupon defendant acknowledged his mistake and paid over to Townes the sum in dispute, to wit, $3.75. Deceased did not seem satisfied and manifested a special unfriendliness to Jim Phelan, who, on account thereof, finally left the place and established a home elsewhere.

Another cause of disturbance in this family was a remark Mrs. Phelan overheard the deceased make to his wife, to the effect that she was furnishing more than her share of the provisions. It appears that each family had been furnishing their own provisions and all of them would eat together at Mr. Phelan's table. After this remark, the families established their own kitchen and dining room and maintained separate housekeeping.

There is also proof tending to show that another cause of unpleasantness was the intemperance at times of the deceased, who frequently drank too much on visiting the city and when he returned home at night would become disagreeable to his family. The defendant testifies that on two occasions, Mrs. Townes ran screaming from her husband's room to her parents' room at night, saying that her husband was going to kill her and asking protection. There is proof also tending to show that on one

occasion the deceased fired off his pistol while in the house, probably while under the influence of liquor. The defendant also testified that on another occasion he had been notified by his daughter that her husband, the deceased, had become angry with her while they were on a visit near Mt. Juliet and had kicked her.

The record also reveals that, after these antagonisms arose, defendant contemplated moving his family away and made one or two ineffectual efforts to rent another house. There was also proof on behalf of the State tending to show that during this time the defendant expressed unfriendliness to the deceased, complaining that he could stand as much as he could stand, and to one H. B. Carter, on the day before the killing, stated that he had a notion two or three times of killing deceased. Witness said to defendant, "Don't do that." Defendant replied, "I won't say that I will. I have tried to get him to fight me." Witness advised defendant, if he could not get along with him, to get off the place. Defendant replied, "We did think of moving down to a little place across the road," but added, "Annie," (his daughter) "wants me to stay here to protect her." Another witness testified that defendant told him about the trouble he was having in getting along with the deceased and finally said to witness, "About the only way I can get along with Bob (the deceased) is to take a double barrel gun and blow his head off his shoulders." In this same conversation defendant said to witness that deceased, on one occasion, had gone into his room, closed

the door and fired off his gun. Defendant asked the witness, "Ain't that threats?" I think that's threats. Ain't that threats?" Defendant then asked the witness if he thought deceased had shot off his gun to terrorize defendant's family, remarking, "If he's doing it for that, I'll not take it off of him. I'll shoot his head off."

These latter threats are proven by one Tom Williams, a negro, and they seem to have been made while defendant was laboring under some excitement from either real or imaginary insults heaped upon him or his family by deceased. Further it appears that while defendant protested he was not afraid of deceased, he yet manifested great uneasiness lest deceased should do him or his family some hurt. This is shown by the following evidence:

Tom Williams (colored), on cross-examination, deposed as follows:

"Q. You say the first time Mr. Phelan was down at your house talking with Mr. Townes, he asked you how you got along with him? A. Yes, sir.

"Q. And then he said he believed Mr. Townes was going to kill him or some member of his family? A. Yes, sir, he asked me somehow or another in that direction.

"Q. It was along that line? A. Yes sir.

"Q. And before he shall do it, I will get my gun and shoot him? A. 'Blow his head off.' He seemed to be uneasy or afraid or badly scared.

"Q. When he first came down there he seemed to be uneasy and frightened? A. Yes, sir.

"Q. And asked how you got along? A. Yes, sir.

"Q. And said he could not get along, and believed he intended to hurt him and his family? A. Yes, sir.

"Q. And before he would permit him to hurt them, he would take his gun and shoot him? A. Take his gun and blow his head off his shoulders.

"Q. That was in the same connection in which he told you he was afraid he would hurt him or some member of his family? A. Yes, sir."

Witness Carter testified that Phelan said he had a notion of shooting Townes, and that Carter said to him: "I would not do that."

"Q. And when you said, 'I wouldn't do that if I was you,' what was it he said? A. I didn't mean to say that I will."

The next witness on the alleged threats was Alex. Hines, who testified as follows:

"Q. What, if anything, did he say he (Phelan) was going to make. A. As well as I remember, he said he was going to make his crop there—that he had went there for that business, and was going to tend to that business, and was going to stay there and make his crop.

"Q. Now, what was it, as near as you recall? A. The best I recall he said he was going to make his crop, no matter what the consequences were."

The tragedy occurred late in the afternoon of June 24, 1904. There were no eyewitnesses excepting the immediate participants and Miss Mamie Phelan, the daughter of the defendant.

Phelan v. State.

An incident immediately preceding the killing and which is supposed to have infuriated the deceased is detailed by Enoch Phelan, a son of the defendant. According to the testimony of this witness, on that after-noon he and George Hunter, a young employee on the place, had been gathering fruit preparatory to coming to Nashville to sell it and had taken the ladder from the barn to the orchard and had left it there. About six o'clock the deceased went to the barn for the purpose of feeding his stock and, discovering that the ladder was not in the barn, he became very angry. Enoch Phelan testifies that he was in his mother's room reading the paper when the deceased came around from the barn, cursing and complaining that the ladder was not at the barn and hence he could not get up there to feed his horses. Enoch got up and explained to deceased how he came to leave the ladder in the orchard, telling him he would go after it. While this witness was at the orchard, procuring the ladder, the killing occurred. At this time the defendant was seated on the back porch of the Phelan home leaning against the hall door. This back porch is ten feet long and ten feet wide. Defendant testifies that he tried to pacify deceased about the ladder, telling him he would make a new ladder for them to gather fruit with and would not bother the ladder any more. The deceased, in an angry mood, passed over this little back porch through the dining-room into his bedroom, distant about six or seven steps from where the defendant was sitting. The defendant testified that he heard his daugh-

ter exclaim, "Mr. Townes, every time you get mad, you come in here for your whiskey bottle and then for your pistol." To which he replied, "What in hell have you got to do with it?" Defendant states that his daughter then made an outcry, saying, "Don't, Mr. Townes. You hurt." That she was making a gurgling noise as if being choked. In this defendant is corroborated by his daughter, Miss Mamie Phelan, who at the time was in the back yard and claims to have seen through the dining room window, near which she was standing, the deceased choking her sister; saw her scuffling to get away from him and heard her scream repeatedly, and saw her running from where she was being choked through the dining-room out to the little porch where the defendant was seated. The defendant exclaimed, "Bob, I can't stand everything." To which deceased replied, "By G—, you will stand it and more too," and immediately came out through the dining room towards the little back porch with his pistol in his hand, as testified to by defendant, Miss Mamie Phelan and Miss Willie Phelan. Defendant immediately arose, went to his room, procured his double barreled shotgun and stepped from the porch into the back yard just as Townes came out on the porch with his pistol in his hand. Defendant with his face towards deceased continued to back twenty or twenty-five feet away, when he said, "Bob, you had better go back," and deceased replied, "By G—, I am ready for you." Deceased continued to advance with his pistol presented at defendant. Defendant had backed out into the yard

towards the garden gate and when about forty-six feet from the porch he fired and deceased, with his pistol in his hand, fell to the ground a few feet from the back porch, in the direction of the garden gate near which defendant was standing. Deceased was shot with small bird shot, No. 6, delivered from a double-barreled shotgun. It is claimed by defendant that the other barrel was accidentally discharged and took effect in the guttering and boxing and shingles of the house.

The State introduced no witness to contradict the defendant's account of the shooting, but seeks to do so by circumstantial evidence.

The first witnesses outside the family who reached the body were W. T. Burns and his son, James Burns, who lived probably one hundred yards from the Townes house and who were attracted there by the firing. These witnesses testify that when they reached the rear of the house defendant was standing about thirty or thirty-five feet northeast of the back porch and deceased was lying on the ground about four feet from the back porch—lying on his breast with his feet towards the porch. These witnesses also testify that no pistol was seen about the body of deceased nor was the defendant's gun to be seen. The defendant explains why the gun and pistol were not seen by these witnesses. He states that immediately after the shooting, he carried the gun to the porch where his wife was standing and handed it to her. He further states that he picked up the pistol and carried it into his

bedroom and deposited it in the corner drawer of a sideboard. As a reason for putting the pistol away, defendant states that he was afraid that, in the excitement, some one might pick it up and use it on him. Defendant was further asked why he put one shell in his shotgun after the shooting and stated in reply that deceased had relatives and friends around there and he did not know but they might come in and do him some violence.

The sheriff testified that after the shooting, when he had arrested defendant and brought him to the jail, the latter told him he had left deceased's pistol on the ground. It is also true defendant did not in his testimony deny making this statement to the sheriff.

Deputy sheriff Kiger, after the shooting, went out to the Townes residence. He met Phelan on his way to Nashville, coming to surrender to the sheriff, and, after getting to the Townes home, he took charge of Townes' pistol. He was asked by the counsel for the State and replied:

"Q. Where was the gun? A. It was behind the door that leads off of the little porch into the side where Phelan was said to have lived.

"Q. You mean there, behind that door? A. Yes, sir.

"Q. Where was the pistol? A. In the top bureau drawer.

"Q. Where was it standing? A. Right there, in the corner."

He was asked by counsel for defendant as follows:

"Q. You got it out of the bureau in Mr. Phelan's room? A. I didn't get it out myself.

"Q. Who did get it out? A. Some young man; I don't know whether it was his son or not."

Enoch Phelan, son of the defendant, testified as follows about the pistol:

"Q. Did your father make any statement to you as to the whereabouts of Mr. Townes' pistol? A. Well, when I got there, I asked him.

"Q. Did he or not tell you where the pistol was— where he had put it? A. He didn't until I asked him.

"Q. However, you asked him? A. Yes, sir, he told me.

"Q. When the officers came out. that night, Mr. Kiger, Sheriff Cartwright, and others, who was it gave them the pistol? A. Myself.

"Q. Is that the pistol, or one like it? A. Yes, sir; that is Mr. Townes' pistol, and the one I gave Deputy Sheriff Kiger.

"Q. Where did you get it? A. I got it out of the sideboard, right in my mother's room, right by the side of where the gun stayed."

The Burns witnesses testify that when they reached the scene of the tragedy the wife of deceased was bending over his body crying and moaning. Witness Burns was endeavoring to console Mrs. Townes, when defendant spoke up and said, "I told Annie there was no use going on that way. I told her he was dead." Mrs. Townes replied, "Papa, there was no occasion for this."

Defendant said, "Annie, I thought he was abusing you or choking you." Mrs. Townes replied, "No, sir, he was not doing anything of the kind." Defendant further remarked to witness, "Mr. Burns, I can't take everything. This man has abused me and I have taken his abuse as long as I can. I can't stand it no longer. You know me well enough to know I am not afraid of anybody." Mrs. Townes in that conversation also said to the defendant, "Papa, if you had not dared him out there two or three times, there wouldn't have been no harm done," or something to that effect. In the same conversation the defendant said to witness Burns that the deceased was coming at him with a pistol. The language of the witness is, "Mr. Phelan said he could not stand it. Mr. Townes was coming at him with a pistol."

Several witnesses testified that they heard no denial by defendant of the accusation of his daughter that he had called or dared deceased out of the house two or three times, nor did the defendant testify that he had denied said statement at the time it was made. He did testify, however, that he did not dare the deceased to come out of his room.

On this subject counsel for defendant requested the court to charge three several propositions. The first instruction was properly rejected, for the reason it contained a statement to the effect that the witness, James Burns, had said that defendant replied to the accusing statement of his daughter, "No, daughter, I had to kill him—he was advancing on me with a pistol at the time."

As a matter of fact, James Burns had not so testified and for this reason it was vicious and should not have been charged.

The third request was as follows:·

"The statement claimed to have been made by Mrs. Townes to the effect that the defendant invited or dared the deceased to come out of the house is not competent evidence of the fact that any such invitation or dare was made by the defendant. Such statement, if made by her, and if permitted by the defendant to pass unchallenged, is not to be received or considered in the same light that it would be entitled to be considered if Mrs. Townes had appeared upon the witness stand and testified to this; such statement, at most, can only be looked to as a circumstance tending to show the guilt of the defendant, and, as such, is entitled only to such weight as you think it is entitled under all the proof in this case.

"Refused; the law on this subject having been substantially charged. W. M. Hart." Refusal to grant this request is assigned as error.

Request No. 4:

"If, from the proof in this case, it appears that the defendant denied the statement claimed to have been made by Mrs. Townes that he (the defendant), invited the deceased, or dared the deceased, to come out of the house, or if what he said at the time in response to the statement made by Mrs. Townes, under all the circumstances of the case, in effect amounted to a denial of her statement, as aforesaid, then the court charges you that the

statement claimed to have been made by Mrs. Townes is incompetent, and should not be considered by you as evidence for any purpose.

"Refused; the law on the subject having been substantially charged. W. M. Hart, Judge." Refusal to charge this request is assigned as error.

Request No. 5:

"If you believe, from the evidence in this case, that Mrs. Townes said, in the presence of this defendant, immediately after the shooting of her husband, 'that you ought not to have invited him out or dared him out of the house,' and that defendant failed to make any response to such statement, then you will consider whether, under all the surrounding circumstances, considering the grief and distress of Mrs. Townes at the time, and the defendant's relation to her, etc., it was natural to be expected that he would go into any discussion or make any denial of her statements at such a time, and if you believe that it would not have been natural for him under those circumstances to have gone into any discussion or make any denial of her statements, then no importance or significance can be attached to the fact that defendant made no denial of her statement.

"Refused; the law on this subject having been substantially charged. W. M. Hart, Judge." Refusal to charge this request is assigned as error.

The trial judge, as stated, declined to submit these instructions, for the reason that he had sufficiently or substantially charged them. We have carefully examined

the charge of the court and fail to find any instructions on the weight to be given to the accusation of Mrs. Townes or how this character of testimony should be received by the jury.   On the contrary, the jury were left to infer from the instructions given that the accusation of Mrs. Townes against the defendant was to be considered as direct testimony that the defendant had dared the deceased to come out of his room.  In stating the theory of the State, the court said, among other things, as follows:

"That a controversy arose between the deceased and the defendant above explained, and that the defendant procured a shotgun, and then dared or invited the deceased to come out."

Again, in charging a request submitted by the State, the court said:

"If you believe from the proof that the defendant dared or invited the deceased to come out of his room, and defendant at the time had prepared himself with a loaded shotgun, and the purpose of the defendant was to provoke a difficulty with deceased for the purpose of securing an opportunity to kill deceased, and in response to his dare or invitation, deceased came out, and if when deceased appeared, defendant was in a hostile attitude toward deceased, or in the act of firing upon him, defendant's assault on deceased, under such circumstances, would not, under the law, be justifiable, and the justification of self-defense would not, under such circumstances, be available to defendant, although you may be-

lieve that deceased appeared with a pistol in his hand at the time."

The question then presented for our determination is whether or not the supplemental requests submitted on behalf of the defendant should have been charged.

A review of the law on this subject will be useful at this point. In *Kendrick* v. *The State,* 9 Hum., 723, this court said:

"If a man be charged with the commission of an offense and he neither admit nor deny it; if facts in relation thereto, of which, if true, he must be cognizant, be charged in his presence and hearing to exist, and he do not controvert them, proof of such charge having been made is legitimate. But, if he deny the charge of his guilt, if he controvert the truth of the facts, proof of such charges cannot be made, because they are mere charges unsupported by oath and lack that confirmation which is supposed to be given to them by the implied admission of the person charged in not denying them."

In *Deathridge* v. *The State,* 1 Sneed, 80, it appeared that certain persons had accused the prisoner in his presence, saying that he had sent for them and advised them that, "a good haul could be made." This charge the prisoner denied, yet it was permitted to go in evidence against him. The court adjudged this to be error, saying:

"If the prisoner had remained silent under the charge it was competent to go to the jury as a circumstance for such inference as the facts attending it might reasonably

warrant. But the denial reduced it to a mere charge, and certainly that is no evidence of guilt." Citing *Kendrick* v. *State*, 9 Hum., 723.

In *Daugherty and Wife* v. *H. C. Marcum et al.*, a civil case, 3 Head, 323, this court said:

"All persons being *sui juris* are required to speak out when an assertion is made, or an act done in their presence, or with knowledge on their part, incompatible with their legal rights; and the failure to do so is taken as a tacit admission of the truth of the fact so asserted, or of the right of the person to do the act. This cogent principle applies as much between relatives as it does to strangers."

In *Queener* v. *Morrow*, 1 Cold., 123, 129, 130, also a civil case, this court said:

"The general rule is that an admission may be presumed, not only from the declaration of a party, but even from his acquiescence or silence. . . . The force and effect of such an admission must, of course, depend upon the circumstances under which it is made. In some cases, if clearly proved, it will be evidence of the most convincing kind; in others, it may be of very little force and perhaps entitled to no consideration. . . . And it is always to be borne in mind that it is the most dangerous kind of evidence. . . . In order that a party may be affected by the statement of another, on the ground of his implied admission of its truth by silent acquiescence, it must distinctly appear that he heard and fully understood such statement. . . . The oc-

casion must also have been such that the party sought to be affected was at liberty to interpose a denial of the statement; and he must not only have had the opportunity to speak, but the statement must have been in respect to some matter directly affecting his rights, so as properly and naturally to demand a contradiction, if untrue."

Mr. Elliott, in his recent work on Evidence, vol. 1, sec. 221, says as follows:

"But in order that admissions may be inferred from silence or acquiescence, it must usually appear that the language or conduct in question were known and understood by the party claimed to have acquiesced therein, and that he was naturally called upon to take some action or make some response thereto. Such evidence should be received with caution. but if it is uncertain whether the party claimed to have acquiesced therein heard and understood the statements, the question is usually one for the jury to determine."

Again, at sec. 230, the same author says:

"The general rules governing the subject of this section have already been stated and it has been shown that silence and apparent acquiescence to be effective as an admission, must be such, or under such circumstances as to 'exhibit some act of voluntary demeanor or conduct,' of the party sought to be charged with the admission."

This question arose and was considered by this court in *Green* v. *State*, 97 Tenn., 50, 62-66.

Phelan v. State.

The court, in that case [pp. 64, 65], instructed the jury that

"Such evidence should be carefully and cautiously scrutinized, as it is considered of a dangerous character and, before any inference of an implied admission or acquiescence in the truthfulness of the statement can be drawn by the jury against the defendant, it must appear affirmatively that the defendant heard and fully understood the statements; that they were made under such circumstances as afforded the defendant opportunity to speak or act, or the circumstances did not naturally, properly, or reasonably call for a denial on his part, or the peculiar circumstances prevented a denial, you would not give any weight whatever to defendant's silence or failure to contradict the same. But if it appears that any such statements are proven and defendant heard and understood the same and had the opportunity to act and speak, and the statement naturally and reasonably called for a denial on the part of the defendant and was such as reasonably permitted a denial, and he did not contradict or deny the same, then the jury may consider the same as proven for the purposes aforesaid, not as proof or evidence of the circumstances detailed in the statements, but to draw such inference as they think right. It is a rule of law that when a prisoner is accused of crime and remains silent under the charge, such fact may go to the jury as a circumstance for such inference as it may reasonably warrant. But acquiescence to a statement, to have the effect of an ad-

mission, must exhibit the same act of the mind and amount to voluntary demeanor or conduct of the party. And where it is acquiescence in the conduct or language of others, it must plainly appear that such conduct was fully known and the language fully understood by the party before any inference can be drawn from his passiveness or silence. The circumstances, too, must not only be such as afforded him an opportunity to act or to speak, but such, also, as would properly and naturally call for some action in reply from men similarly situated, and you, as jurors, should look to all the surroundings and circumstances confronting the prisoner, and his explanation of same."

This court, in speaking of that charge, said:

"In view of the strong admonition delivered by the court to the jury, in respect of the dangerous character of this evidence and the very circumscribed limits within which they are permitted to consider it at all, we are unable to perceive any error in the admission of this testimony of which the prisoner can complain."

This court further said:

"It is admitted that such evidence should always be received with much caution. In some cases it may be equivocal and of the lightest possible value; in others, it may be entitled to much weight. Its value, of necessity, must be estimated by the jury. If it is doubtful whether the defendant heard or understood the proposition, to which his silent assent is claimed, the jury may determine it. The degree of credit due to such

Phelan v. State.

tacit admissions is to be estimated by the jury, under the circumstances of each case." See also Rice on Evidence, vol. 3, p. 501.

Mr. Wharton in his work on Criminal Law,,sec. 696, says:

"Where a man had full liberty to speak, and not in the course of a judicial inquiry, is charged with a crime and remains silent, that is, makes no denial of the accusation by word or gesture, his silence is a circumstance which may be left to the jury."

In *Commonwealth* v. *Kenney,* 12 Metc. [Mass.] (S. C., Amer. Dec., 672), it was said that, if the statement is not heard by the accused, or if being heard, he denied it, or if circumstances existed at the moment which prevented a reply or rendered a reply inexpedient or improper, the evidence certainly is of no value." *Low* v. *State,* 108 Tenn., 127, 128.

An analysis of these cases will show (1) That when the accusation is denied, it is not admissible at all as an evidential fact and has no probative effect whatever. (2) When the defendant stands mute in the face of the charge, that fact is interpreted as a circumstance tending to show guilt, provided the defendant heard and understood the charge, and the situation of the parties demanded a denial, all of which must be left to the determination of the jury. (3) That evidence of silent acquiescence is of a dangerous character, and must be received with great caution.

There is not one line in the charge of the trial judge

instructing the jury how they should weigh and determine the statement of Mrs. Townes, nor was there any admonition to the jury of the dangerous character of this evidence, and that it should be received with great caution. It is the province of the jury to interpret such silence and determine whether defendant's silence was under the circumstances, excused or explained. In the absence of any instructions on this subject, counsel for defendants submitted the supplemental requests marked three, four and five.

The third request was to the effect that such an accusation if allowed to pass unchallenged, can only be looked to as a circumstance tending to show the guilt of defendant, and, as such, is entitled only to such weight as the jury might give it, in view of all the proof in the case. The refusal of the court to give this request was prejudicial to defendant and is reversible error.

The fourth request was to the effect that if defendant denied the statement of Mrs. Townes, or if what he said at the time, under all the circumstances of the case, in effect amounted to a denial, then the statement claimed to have been made by Mrs. Townes is incompetent and should not be considered by you as evidence for any purpose.

We do not think this instruction should have been given, for the reason defendant did not claim that he had denied the statement of Mrs. Townes, nor was any fact relied on by him as amounting to a denial of such charge.

The fifth request was to the effect that if the statement was made in the presence of the defendant and he failed to make any response to such statement, then the jury should consider whether, under all the surrounding circumstances, considering the grief and distress of his daughter, a denial of her statement was demanded.

This instruction should have been submitted to the jury under the authorities already cited.

It is also assigned as error that the trial judge failed to instruct the jury as to the effect of defendant's proof as to his good character.

It is certainly true that the court should have given the jury some instructions on this subject—especially in view of the excellent character proven by defendant. The court correctly told the jury that proof of good character should be looked to in weighing the credibility of witnesses and that defendant's testimony should be weighed as that of other witnesses, but he failed to charge that proof of good character would strengthen the presumption of defendant's innocence, as frequently held by this court. We find, however, there was no request for further instructions on this subject.

Reversed and remanded.