[No. 6557. Decided October 10, 1907.]

## THE STATE OF WASHINGTON, *Respondent*, v. JOSEPHINE BARUTH, *Appellant.*[1]

CRIMINAL LAW—DECLARATIONS IN PRESENCE OF ACCUSED—ADMISSIONS. *Ante mortem* statements of deceased relating to the issues, made in the presence of the accused, are admissible, where she was at home in another room with the door open within easy hearing, and were made under such circumstances that she would without doubt have replied thereto if she did not wish to acquiesce therein; but statements made after the door between the rooms was closed, while the accused was engaged in conversation, although she might have heard and denied the same, are not made in her presence or under circumstances calling for a reply.

SAME—RELEVANCY. *Ante mortem* statements of deceased, made in the presence of the accused, are admissible only so far as they relate to the shooting from which death resulted, its immediate cause, and the conduct of the parties at the time which was part of the *res gestae;* and statements of conduct at other times, or irrelevant to the issue, are inadmissible.

HOMICIDE—CAUSE OF DEATH—NEGLECT OF PHYSICIAN—DEFENSES. The fact that wounds inflicted by shooting were not skillfully treated or accorded the best medical treatment is no defense to a prosecution for homicide where it is not shown that neglect or unskillfulness was the sole cause of the death.

[1]Reported in 91 Pac. 977.

CRIMINAL LAW—APPEAL—FAILURE TO REQUEST INSTRUCTION.   In
a prosecution for homicide, the failure to caution the jury as to ad-
missions by the accused by acquiescence in an *ante mortem* state-
ment made in her presence is not reversible error where no request
was made for such instruction.                        :

Appeal from a judgment of the superior court for Spo-
kane county, Huneke, J., entered May 21, 1906, upon a trial
and conviction of manslaughter.   Reversed.

*M. J. Gordon* and *Sullivan, Nuzum & Nuzum*, for appel-
lant.

*R. M. Barnhart, Fred C. Pugh,* and *A. J. Laughon,* for
respondent.

FULLERTON, J.—On March 26, 1906, the appellant shot
one C. L. Baruth with a revolver, inflicting upon his person
certain wounds, from which he died four days later.   There-
after she was informed against for murder in the second de-
gree, tried and found guilty of manslaughter, and sentenced
to imprisonment in the penitentiary for a term of ten years
and to pay a fine of $1,000.   From the judgment and sen-
tence pronounced upon her, she appeals.

The assignments of error relate chiefly to the admission
and exclusion of evidence, and the giving of certain instruc-
tions and failing to give certain others.   These we will notice
in the order they are discussed in the appellant's brief.   The
state sought to prove the manner in which the crime was
committed by showing the declarations of C. L. Baruth, made
to certain of his neighbors on the evening of the day the shoot-
ing occurred.   To that end it called as a witness one W. E.
Connelly.   Mr. Connelly, after testifying to his acquaintance
with the deceased and certain preliminary matters, further
testified that he, in company with one Charles Steele, called
at the Baruth home about half past seven in the evening of
the day of the shooting; that Mr. Baruth was then lying on
a couch in the front room of the house talking to a Mr. Le-

Fevre, who had also called upon him; that Mrs. Baruth was
not then at home; that Mr. LeFevre stayed for about half an
hour after the witness and Steele arrived, leaving just about
the time Mrs. Baruth returned; that after the departure of
LeFevre, Mr. Baruth arose from the couch and took the chair
vacated by him; that Mr. Steele sat next to him, and the wit-
ness sat on the opposite side of the same room; that Mrs.
Baruth took a seat at a table in an adjoining room—the
kitchen—placed just to the right of the door opening be-
tween the rooms, in sight of the witness, the door between the
rooms being open; and that while the parties were in these
positions Mr. Baruth told the story of the shooting. This
story the witness repeated, over the objection of the appellant,
in the following language:

"A. Mr. Baruth started it by saying 'This is the first
time that I ever revealed a secret regarding my family or
spoke to any man in Medical Lake or any where else of this
trouble about my family in any way and I defy any man to
say so, but this is getting to a point where I will have to talk
I guess' and he went on to say that when he got home Sunday
evening he came in the house he said and laid down on the
sofa and picked up a paper and his wife came in and said
'Where have you been today,'— [Objection by defendant.]
The Court: This is a statement the deceased made? The
Witness: Yes, sir. The Court: Proceed. A. (Continued)
He said 'She asked me where I had been and I made no reply,
I laid there and went ahead reading just as though she wasn't
talking; she next called me a few vile names and by and by
went off and left me and at night I retired.' The next morning
she comes in again and fetched in a coat and spread it down
and she says 'Here is some mud on this coat; that proves the
statement I made last night to you and here is also a hair
and it is not mine either' at the same time pulling a hair off
and showing it to him. She says 'This is not my hair either.'
He said he still made no reply but laid there until she retired
to the kitchen and went on about getting breakfast again and
she commenced to tell the children what kind of a man he
was and he says 'This much I couldn't stand' and he jumps
up out of bed and grabs his pants and went through into the

kitchen door and says— Q. Indicate. A. Here is where he
was. He came through these two doors this time, this door
and this door, and he asked her, repeating the words he used
'What in hell and damnation is the matter with you' he
says; those are the very words he said to her; she retired
through this door and out into this bed room here and through
this way and got a revolver and returned and began shoot-
ing at him and he claimed when she returned to the room
where he was standing he was stooped over ready to put on
his pants; he had his pants in his hand when she fired the first
shot which struck him here (indicating). He grabs a chair
up that sat here and held it up between him and her and he
says she was shooting very rapid and he held the chair up
between them and backed into this room through this door
and just as he got the door closed, he stood at the side of the
door here and he looks around and she stands here at this
window right by the side of him with the gun looking up
through the window; he retreats back and he says 'For God's
sake don't shoot me any more; you have shot me now. That
there is where Mrs. Baruth says 'You ought to have stopped
when I told you. Q. She said that at that point? Did he
say that she said that? A. Yes, he said that she said that he
ought to have stopped when she told him, so he retires to this
room again and sat down and sends for McCorkle, sends the
little girl over to McCorkles and McCorkle came over and
went for a doctor. Q. Do I understand that Mrs. Baruth
stated to Mr. Baruth that then is when he ought to have
stopped? A. Mrs. Baruth said to Mr. Baruth he ought to
have stopped when she told him to. The Court: Did she
interrupt his statement to you, when he was making that state-
ment? The Witness: She just says,— The Court: While
he was telling you that? A. When he was telling me that she
says 'he ought to have stopped when she said so. Q. I don't
understand the statement and I don't think the jury does.
You say he stated, Mr. Baruth stated, that she said he ought
to have stopped? A. She says when Baruth says that, she
says to Steele right there,—she turns to Steele and says 'He
ought to have stopped when I told him to.' Q. Proceed with
any further conversation that you heard there or which was
had, either by the defendant or Mr. Baruth in her presence.
A. He said he sent for Mr. McCorkle to come over and he
came and he sent him for the doctors. Q. During that con-

versation did he tell you how many times he was hit during the shooting? A. No, sir, he didn't say——yes, he said when he went in he was shot twice. Q. I mean at this conversation? Do you recall anything further of the conversation that passed between you and Mr. Baruth in the presence of the defendant or that was said by the defendant at that time? A. Mr. Steele he gets up and goes into the room and talks with Mrs. Baruth and Mr. Baruth and I sat there and talked for probably half an hour that he was in there. Q. During this conversation just him and you there alone? A. What I have stated was heard by all. Q. When Mr. Steele went into the kitchen where Mrs. Baruth was do you know whether or not the door was closed after him. A. When he went into the kitchen he closed the door behind him, yes sir. Q. Did you from where you were sitting hear any conversation between Mr. Steele and Mrs. Baruth with respect to the shooting? A. I did not. Q. And the subsequent conversation with the deceased on that night was not in the presence of the defendant? A. The remainder was between Baruth and I alone. Q. In that conversation did Mr. Baruth repeat the names which he said his wife called him? A. Yes, sir. Q. What did he say they were, Mr. Connelly? [Objection by defendant. Overruled. Exception.] Q. If you recall what those names were, state them? A. Well he said she called him a pimp and a whore master and that he was chasing women all the time and a few other vile names, I couldn't say exactly what he did say. He says 'This was a common occurrence when I came home' and that he paid no attention to it, when he came home and dressed up——he said 'Always when I went away from home dressed up, put on a white shirt and went down town and came home, there was always trouble."

Mr. Steele was also called as a witness. He described the situation pretty much as it was described by the preceding witness, probably placing Mrs. Baruth a little closer to the open door than she was placed by Mr. Connelly, and adding that the place where she sat was about ten feet distant from the position of Mr. Baruth. The record then shows the following:

"Q. Proceed, Mr. Steele, and relate to the jury as near as you can recall what was said and done during the conversa-

tion that has been referred to at the time and place referred to, and when the parties were maintaining toward each other the relative positions that you have described, touching the shooting and circumstances that led up to and surrounded the shooting? Mr. Swanson: We object for the reason it has not been shown the defendant would have heard the statement made at the time, but as in fact the circumstances show that she would not be apt to have heard it; he says that the way they were sitting it must have been about ten feet, and from the relative positions shown by the map the voice would have to travel first in an easterly direction then west to this door, and the circumstances show that this defendant could not very well have heard it, and I think anything as questionable as that ought not to be allowed to go in here; the statement was self serving, not a dying declaration and not a part of the *res gestae.* The Court: Objection overruled. Exception. Q. Proceed, Mr. Steele. A. You want the story related? Q. I want the story related at that time and place and any interruptions or suggestions that may have come from Mrs. Baruth or any question or statement that you or Mr. Connelly or any one else present made in the presence and hearing of Mrs. Baruth respecting this matter, the substance of it as near as you recall. A. When he started to tell his story he started out by saying 'This is the most contemptible piece of humanity that God Almighty ever put the breath of life in.' Then he says 'This all comes from my putting on a white shirt and going down town Saturday evening.' He says 'When I was going to lodge I put on a white shirt and I goes down to lodge and she makes a great kick before I started' and he says 'Sunday morning I got up and put on my collar and wore my white shirt down town on Sunday'—this was the day before the shooting, and he said 'There was always a kick whenever he put on a white shirt and went out' so he says 'I never before have revealed any secret or any trouble that ever happened in my family' and he went on to tell about when he came home the night before, on Sunday evening; he laid down on the lounge and she came around and was accusing him of being with other women, and she called him violent names and he said he said nothing but went to bed and the next morning she came in and was examining his clothes; he said she took his underclothes and turned them wrong side out and examined them all over; she examined them all through to see

if she could find some hair or anything, and then took his overcoat; it had mud on it and she spread that out and showed him, showed him where he had had his overcoat down in the mud and he said that he didn't say anything to her and she went on calling him names.— Q. Did he repeat the names that he claimed she called him?' A. No, I don't remember— Q. Proceed. A. (Continued) So she comes out in the kitchen and commenced telling the little children a lot of stuff that wasn't for little children to hear and it made him angry so he says he jumped out of bed and went out and asked her what in the hell and damnation she was doing and he says she run around and went through the kitchen door and run around the house; he proceeded to put on his pants and while he was putting them on she came running in and fired at him so he says he retreated back in the bed room as fast as possible and as he was going he picked up a chair to shield the bullets away; after he went into the bed room he said he looked out of the window and she had gone around there looking through the window and if I remember right he said she shot through the wall or door or something from the outside and so he said he retreated back further in the other bed room or back the other way where she couldn't get at him, and I guess that is the most of his story. Q. How many shots hit him? A. He said she hit him twice; he said several shots were fired but only two hit him. Q. Do you recall anything further said at that time and place while you were sitting in the relative positions suggested before by you, either by the deceased or by the defendant, Mrs. Baruth, touching upon the shooting? A. He said that at one time he was worth ten thousand dollars and she broke him up until he didn't have a dollar and that she was always continually telling stories outside to people trying to make him out an awful man and such as that. I don't remember anything more just now. Q. Did he go into any particulars and tell you—do you remember what this woman was saying to the children which angered him? A. He said that she was telling the children about him being with other women; he didn't come out and say the words that she used at all; said that she was telling them what a bad man he was and how he had been out with other women. Q. During the statement which he then and there made, do you recall any interruption or any statement that Mrs. Baruth herself made,

or any response or any denials or any statement whatever that she made? A. Not right at that time, no sir. Q. Did she make any statement or response whatever during that time or until later when you and she were alone? A. No. Q. Were any persons in the house other than the children, Mr. and Mrs. Baruth, yourself and Mr. Connelly at the time this statement was being made? A. If there was, I didn't see them; I was only in the two rooms, the kitchen and the sitting room. Q. You knew nothing about the other rooms, the bed rooms? A. No, sir. Q. Afterwards at any time during the evening, did you have any other conversation, did you have any conversation with Mrs. Baruth herself? A. I did. Q. About how long was it after this talk you heard from Mr. Baruth? A. Probably ten or fifteen minutes. Q. Where did you have that conversation? A. In the kitchen. Q. Were any other persons present beside yourself and Mrs. Baruth? A. No, sir. Q. Where was Mr. Baruth and Mr. Connelly? A. They were in the sitting room. Q. Was or was not the door leading from the kitchen to the sitting room open while this conversation was going on with Mrs. Baruth? A. No, I closed it when I went out. . . . In the meantime while me and Mrs. Baruth was talking, Mr. Connelly and Mr. Baruth in the other room, every time they would say anything we could hear them distinctly— Q. Was the door closed? A. With the door closed, yes, sir; and no matter whether we was busily engaged in the subject or not Mrs. Baruth would stop and listen whenever Mr. Baruth would speak, and of course if it didn't amount to anything pertaining to this incident she would go ahead then with her story with me, but if it was about her, relating to this incident, she would listen; one time in particular while we were talking, Mr. Baruth was merely relating over again what he had related to us, that is, one part of it, and that is when she came up to the bed room door, or at least when she came in and was shooting at him, and he says,— well, he started to tell, when she stopped—we were talking and she stopped to listen, and I heard him distinctly, the words he used, he says 'She commenced shooting' and he says 'I threw up my hands and hollered for God's sake stop you have shot me now' and he says 'I was retreating back in the bed room as fast as I could' and he says 'she kept on shooting and he bleeding.' He was just merely relating what he had related to Connelly and myself; she turns right around to me

and looks at me and says 'Yes,' she says, 'He ought to have stopped when I told him to.' I don't know but what that is about all of the story."

It is the contention of counsel for the appellant that the admission of these recitals in evidence was error. They argue first that it was not shown that they were made in the presence or hearing of the appellant, or if in her hearing that they were made under such circumstances as called for a denial upon her part; and second, that if any part of it was admissible the court opened the door too wide, in that he permitted the witnesses to recite statements denunciatory of the appellant which could not have been evidence against her even had the person making the statements been upon the witness stand himself.

But before discussing these objections, it is necessary to notice for a moment the legal aspects of the question. Counsel for the state contend broadly that any statement or declaration of the person injured made to a third person, in the presence or hearing of the accused, either charging him directly with the crime or pertaining to matters otherwise relevant to the issue, if not denied by the accused, may be given in evidence against him as an admission on his part. On the other hand, the appellant contends that the mere presence or hearing of the accused is not alone sufficient to render the evidence admissible, but the statements must relate to the matter at issue, must be addressed to the accused, or made under such circumstances as would ordinarily and naturally call for some action or reply from persons similarly situated; and that, if the condition be one of doubt as to whether a reply should or should not have been made, the evidence should not be received. There are cases which support the respondent's contention, many of which are collated in its brief. But we think the better authority is with the appellant. Greenleaf, in his work on evidence, while stating that admissions may be implied from the silent acquiescence of a party in the statements

of another, adds that nothing can be more dangerous than evidence of this kind, and that it should always be received with caution, and never received at all unless the evidence is of direct declarations of that kind which naturally calls for contradiction, and then makes this general observation:

"The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." 1 Greenleaf, Evidence (14th ed.), § 200.

In the Encyclopædia of Evidence, vol. 1, p. 367, the rule is stated as follows:

"So the silence of a party when a statement is made in his presence, against his interest, and is heard and understood by him, and is made in such way as to call upon him to deny it, if untrue, and the facts are within his knowledge, and the statement is made under such circumstances as naturally to call for a reply, amounts to an admission of the truth of the statement made, and may be sufficient to establish the fact as against him."

In *People v. Koerner*, 154 N. Y. 355, 374, 48 N. E. 730, the rule is stated as follows:

"That, under some circumstances, admissions by a party may be implied from his acquiescence in the statement of others, is an established principle of the law of evidence. A party's acquiescence, to have the effect of an admission, must exhibit some act of voluntary demeanor or conduct. When the claimed acquiescence is in the conduct or in the language of others, it must plainly appear that such conduct or language was fully known and fully understood by the party before any inference can be drawn from his passiveness or silence. Moreover, the circumstances must not only be such as afforded him an opportunity to act or to speak, but also such as would properly or naturally call for some action or re-

ply from men similarly situated. Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to ascertain what reply the party to be affected makes to them. If he is silent when he ought to have denied, the presumption of acquiescence arises. But it is clearly otherwise when his silence is of a character which does not justify such an inference. Thus, when a person is asleep, or intoxicated, or deaf, or a foreigner unable to understand the language employed, he cannot be prejudiced by statements made by others in his presence. Nor is such silence an assent, unless the statements were such as to properly call for a response."

See, also, *Davis v. State*, 131 Ala. 10, 31 South. 569; *Ackerson v. People*, 124 Ill. 563, 16 N. E. 847; *Commonwealth v. Brown*, 121 Mass. 69; *People v. O'Brien*, 68 Mich. 468, 36 N. W. 225; *State v. Swisher*, 186 Mo. 1, 84 S. W. 911; *Phelan v. State*, 114 Tenn. 483, 88 S. W. 1040; *People v. Amaya*, 134 Cal. 531, 66 Pac. 794.

And in this court, the question suggested, while it has not been before us in the form here presented, is not entirely new. In *Miller v. Territory*, 3 Wash. Ter. 554, 19 Pac. 50, where it was shown that the accused, when arrested and charged with the murder of one of his neighbors, displayed some agitation, and afterwards, when brought into the presence of the body of the murdered man and accused directly of the crime, made no answer but turned away and refused to again look upon the corpse, the court said that there was nothing in the defendant's conduct "which the most ingenious imagination could torture into an incriminating act." In *State v. McCullum*, 18 Wash. 394, 51 Pac. 1044, the defendant was jointly informed against with one Wilson for having burglarized a saloon building and stealing therefrom a quantity of cigars. On his trial an officer was permitted to testify that Wilson made a confession to him implicating McCullum; that he had McCullum and Wilson brought before him when Wilson repeated his statement, and that McCullum when asked what he

had to say concerning it said there was nothing in it. It was held error to admit this testimony; the court saying:

"The fact that in this case Wilson's statement was made in the presence of the appellant and directed in part to the appellant did not thereby render it admissible. The fact that it was so made loses force when we come to consider that appellant was not voluntarily present, did not acquiesce in it, and was obliged to remain and listen to it whether he would or not."

And in *McCord v. Seattle Elec. Co.*, 46 Wash. 145, 89 Pac. 491, it was held that the statement of a third person concerning who was to blame for a street car collision, made to the plaintiff while she was recovering from the shock of the accident, was not admissible as an admission by her, since under the circumstances she could not reasonably have been expected to reply to it.

Adopting the rule contended for by the appellant, it is plain that she has just cause for complaint against the broad ruling made by the trial court. All that the deceased said concerning the shooting itself and its immediate cause, his conduct and the conduct of the appellant while it was going on, in fact, anything related by him that might properly be said to be a part of the *res gestae*, while the parties were in the position described by the witness Connelly, was properly admitted. The position of the parties at that time was such that it can be said that the statements were made in the presence of the appellant, and the circumstances were such that she might reasonably have been expected to reply, had she not intended to acquiesce in them. But this is as far as the statements were admissible. Anything said by him after the witness Steele left the room, closed the door between the two rooms, and engaged the appellant in conversation, could not be admissible. Even if she could under those circumstances hear if she listened acutely the recitals made by the deceased, clearly the circumstances excused her from replying to them. The statements were not addressed to her, neither

were they made in her presence, she could not be certain that
Steele heard them, and it is too much to say that she ought
to have opened the door and denounced them as falsehoods, or
that she should have interrupted her conversation with Steele
to declare to him their untruth if she did not intend to acqui-
esce in them.

We think, too, that the second ground of the appellant's
objection is well taken. Both the prosecuting attorney and the
trial judge seem to have proceeded on the theory that any-
thing said by the deceased at this time touching his relations
with the appellant was admissible as an admission on her part.
The questions propounded to both Connelly and Steele, it will
be noticed, called for the entire recital made by Mr. Baruth, re-
gardless of its relevancy to the question in hand. The wit-
nesses were permitted to detail his statements concerning the
appellant's conduct towards him at other times than at the
time of the shooting, the fact that he was at one time possessed
of considerable property which he lost through her miscon-
duct, and even the expressions of malice and hatred the de-
ceased made against her. Manifestly this was improperly ad-
mitted. Her conduct towards him at other times than at the
time of the shooting, as related by these witnesses, could hardly
have been admissible as evidence had the deceased himself been
on the stand testifying for the state, much less was it admis-
sible when its only relevancy rests on the assumption that the
appellant admitted the truth of the recitals by her silence; the
statement concerning the loss of his property was irrelevant
for any purpose; and his expressions of malice and hatred
towards the witness, while perhaps harmless under normal con-
ditions, were here highly prejudicial, since the recitals under
the circumstances detailed by the witnesses took on the guise
and solemnity of dying declarations, while they were, in fact,
nothing more than the rancorous expressions of a partisan
bent on justifying his own conduct, and condemning that of
his assailant. The recitals should have been confined to what

was said concerning the immediate offense.   See *People v. Smith*, 172 N. Y. 210, 231, 64 S. E. 814.

The appellant called as a witness one Dr. Byrne and proceeded to interrogate him concerning the character of the wounds received by Baruth, whether or not they were mortal, or of such a nature as to necessarily cause death.   On an objection being interposed, the appellant's counsel stated that he proposed to show:

"That the wounds received by the deceased as proven in this case were not mortal wounds; that the best authorities state that in wounds of the upper arm death results in approximately one per cent of the cases; that septicaemia or blood poisoning is not the usual or necessary consequence of bullet wounds; that the Welch or gas bacillus does not of itself cause death and that if it was present in the wound it would have shown in the internal organs of the deceased; and that the treatment afforded the deceased by the physicians in charge was not the best medical treatment."

On this statement being made the court excluded any further evidence concerning the nature of the medical treatment: to which ruling the appellant duly excepted and assigns the same as error.   It is at once manifest that the statement of counsel, even if proven, would afford no defense to the crime charged against the appellant.   Where one unlawfully inflicts upon the person of another a wound calculated to endanger or destroy life, it is no defense to a charge of murder where death ensues to show that the wounded person might have recovered if the wound had been more skillfully treated. Even unskillful or negligent treatment of the wound on the part of the wounded person or his physicians, which may have aggravated the wound and contributed to the death, does not relieve the assailant from liability.   He must show that the negligent and unskillful treatment was the sole cause of death, before he can escape the consequences of his unlawful act on this ground.   *State v. Edgerton*, 100 Iowa 63, 69 N. W. 280; *State v. Landgraf*, 95 Mo. 97, 8 S. W. 237, 6

Am. St. 26; *Daughdrill v. State*, 113 Ala. 7, 21 South. 378; *Sharp v. State*, 51 Ark. 147, 10 S. W. 228, 14 Am. St. 27; *State v. Strong*, 153 Mo. 548, 55 S. W. 78; *Denman v. State*, 15 Neb. 138, 17 N. W. 347; Wharton, Homicide (3d ed.), § 35.  Measured by this test the court did not err in excluding the proofs offered.  These proofs did not tend to show that the subsequent treatment of the wound was the sole cause of the death, but that the treatment was unskillful and at most only contributed thereto.  This did not constitute a defense.

The remaining assignments of error require no separate consideration.  The legitimate evidence was sufficient to make a case for the jury, and no error was committed by the court in refusing to sustain the appellant's challenge thereto.  Nor can we consider the assignment based on the failure of the court to give cautionary instruction concerning the evidence relating to the appellant's admission by silence.  While doubtless cautionary instructions would have been proper, yet none were requested by the appellant, and it is the rule in this state that even positive errors must be called to the attention of the trial court and that court given a chance to correct them, before they can be available here.

For the error above noticed, the judgment is reversed and a new trial granted.

HADLEY, C. J., RUDKIN, CROW, ROOT, DUNBAR, and MOUNT, JJ., concur.