[No. 17752-4-I. Division One. February 8, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. RUTH NESLUND, *Appellant.*

*James E. Lobsenz* and *Wolfe, Lobsenz & Cullen,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Gregory P. Canova, Senior Assistant; Frederick C. Canavor, Jr., Prosecuting Attorney,* and *Charles Z. Silverman, Deputy,* for respondent.

SWANSON, J.—In her appeal of her jury conviction of first degree murder in violation of RCW 9A.32.030(1)(a) while armed with a deadly weapon, a firearm, Ruth Neslund (Neslund) raises the following issues:

1. Was the admission of the .38 caliber Smith & Wesson handgun an abuse of discretion?

2. Was it error to permit the State to attempt to impeach a defense witness with a previously suppressed handgun transfer receipt which was ultimately not admitted into evidence?

3. Does independent evidence establish prima facie the corpus delicti of the crime such that the defendant's confessions and admissions properly were considered by the jury?

4. Was it error to admit Paul Meyers' account of the overheard conversations as an adoptive admission?

5. Was the defendant's right to confront witnesses violated by the admission of Paul Meyers' testimony as to the overheard conversations?

6. Is there sufficient evidence for a rational trier of fact to have found premeditation beyond a reasonable doubt?

7. Did the allegedly improper comment in the prosecutor's closing argument deny the defendant a fair trial?

8. Was evidence of the defendant's shooting at animals properly admitted?

9. Did the trial court abuse its discretion in denying the defense new trial motion based upon Winnie Stafford's alleged incompetence to testify at trial?

Rolf Neslund disappeared in August 1980. At trial Joy Stroup, the defendant's niece, testified that on August 8, 1980, Neslund called her in Ohio and told her that she had a confrontation with her husband Rolf during which Rolf hurt her left breast and her nose and that "Uncle Bob [Neslund's brother, Robert Meyers] held him and I shot him and he's now outside burning in a barrel."

Paul Meyers, Neslund's other brother, testified that he visited the defendant several times during 1980 and 1981, and during one of those visits, Neslund told him that she had shot Rolf twice in the head and killed him. According to Paul Meyers, he also overheard conversations between the defendant and their brother, Robert Meyers, in which the two mentioned that after he was shot, Rolf had fallen over a couch and a storage box and that they dragged his body on a sheet into the bathroom off the master bedroom. Paul testified that the two talked about how Robert had cut up Rolf's body in the bathtub using a broadax and a butcher knife and then carried the body parts in a wheelbarrow out behind the barn, where he built a wood fire in the burn barrel and burned the body parts and later dumped the ashes in a pile of animal waste behind the barn.

Paul further testified that Neslund and their brother Robert discussed how she had withdrawn $75,000 of Rolf's pension money from their joint bank account and placed it in an account in her separate name. Rolf had gotten upset and had told Neslund to put the money back or else, and Robert said that Neslund gave Rolf the "or else."

Winnifred Stafford, Neslund's friend, testified as a State rebuttal witness. At trial she admitted that in the 1982

inquiry judge proceeding she had perjured herself when she gave sworn testimony that Neslund had not told her that she had killed Rolf. Stafford testified that on the evening of August 8, 1980, she went to the Neslund residence after Neslund called and asked her to come over. Neslund told her that she had shot and killed Rolf near the living room couch and that her brother Robert was in the bathroom cutting up Rolf's body. Stafford overheard Neslund tell her son, Butch Daniels, over the telephone that Neslund had killed Rolf. Neslund told Stafford that before the shooting, Rolf had become upset when he found out that Neslund had taken all the money out of their savings account and he did not know what had happened to it.

Neslund testified that on August 14, 1980, Rolf left their home on Lopez Island after having told her that he was going to Norway, and that she never saw him again. Neslund was charged with, and was convicted by a jury of, first degree murder.

### ADMISSION OF SMITH & WESSON HANDGUN

■ During the March 1982 execution of a search warrant for the Neslund residence, a .38 caliber Smith & Wesson handgun was seized upon being found in the bottom drawer of a bureau in the master bedroom. Neslund contends that the trial court abused its discretion in admitting the Smith & Wesson handgun into evidence in that the State did not first prove that the weapon was used in the commission of the charged crime and under *State v. Robinson*, 24 Wn.2d 909, 167 P.2d 986 (1946) and *State v. Lloyd*, 138 Wash. 8, 244 P. 130 (1926), weapons not used in the commission of the charged crime are inadmissible. Recently our State Supreme Court disagreed that these two cases stand for that proposition and instead asserted that *Robinson* and *Lloyd* held that "weapons that are unrelated to the case are not admissible." *State v. Jeffries*, 105 Wn.2d 398, 412, 717 P.2d 722, *cert. denied*, 107 S. Ct 328 (1986).

■ We reject Neslund's argument, for here the testimony of several witnesses establishes the relevance of the

.38 caliber gun to the issue of the murder weapon used. *See State v. Jeffries, supra; State v. Kendrick,* 47 Wn. App. 620, 627, 736 P.2d 1079, *review denied,* 108 Wn.2d 1024 (1987). Evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401; *State v. Kendrick, supra.* Moreover, a trial judge's relevance determination will be undisturbed on appeal absent a clear abuse of discretion, *i.e.,* only where no reasonable person would take the view adopted by the trial court. *State v. Kendrick, supra.*

Here Michael Grubb, Washington State Patrol Crime Laboratory criminalist, testified that the Smith & Wesson gun had been cleaned since it was last fired, but upon examining the gun under a low–powered microscope, he found eight small blood droplets on the face of the gun's cylinder, one blood flake which was loose but was still adhering to the extractor shroud, and two small blood spots under the thumbpiece (the mechanism which slides forward to release the cylinder), which spots were observable when the thumbpiece was slid forward. Each of these spots, subjected to two chemical tests, showed a positive result for the presence of blood.

According to Grubb, the blood spots under the thumbpiece most likely were deposited there in one of two ways:

> Either the thumb of the person operating the gun had blood on it, and in the operation of moving the thumb piece to open the cylinder, blood was deposited under and behind the thumb piece, or at some point there was a larger amount of blood deposited on the frame and subsequently wiped off. But the blood under the thumb piece was missed.

Grubb testified that the eight blood droplets on the face of the cylinder head, which were high velocity blood spatters caused by blood which is accelerated at a high velocity, could have been caused by blood spattered back from the object into which the gun was fired, and that the pattern of

blood spots on the gun was consistent with the high velocity back spatter of a gunshot wound to an uncovered area of a human being or animal from a distance of 3 feet or less. Grubb's testimony was unrebutted.[1]

The gun's probative value is brought into focus by the testimony of certain prosecution witnesses. Joy Stroup, Neslund's niece, testified that on August 8, 1980, Neslund telephoned her and told her that there was a confrontation between Neslund and Rolf and that Neslund's brother, Robert Meyers, held Rolf and she shot him. Paul Meyers, Neslund's brother, testified that several times during his visits to Neslund's home in December 1980 and during 1981, Neslund or their brother Robert, in her presence, stated that Neslund had killed Rolf, and on one occasion Neslund said that she shot Rolf twice in the head. Sergeant Rodney Englert of the Multnomah County Sheriff's Office in Portland, Oregon, who is an expert by training in forensic blood spatter pattern analysis, analyzed the minute blood spots found on the living room ceiling of Neslund's home and determined that they were high velocity mist which, based on their location in two separate areas of the ceiling, he determined had come from two gunshots. According to him, the pattern of the high velocity mist was consistent with blood being deposited on the ceiling from two gunshot wounds to the head of a person in the area of the living room couch.

Neslund contends that the gun's relevance was not shown since the unrebutted evidence was that she obtained the gun in December 1980, 4 months after the alleged murder, and the gun was not found in her residence until 18 months

---

[1]While Neslund asserts that another state laboratory criminalist who examined the gun did not detect any blood on it, Neslund's citation to the record is to a colloquy between the trial attorneys and the trial judge during which the State brought a motion in limine, which was granted, to preclude questioning Michael Grubb about any examination of the gun done by Judy Erickson since Grubb's report, done before Erickson's, was written without knowledge of Erickson's report. The State indicated that if she were called, Erickson's testimony would be that she conducted only a visual, not a microscopic, examination of the gun for the presence of blood and performed no tests on it.

after the crime allegedly was committed. Outside the jury's presence the prosecutor asserted that the credibility of Robert Jenkins, whose affidavit states that he sold the Smith & Wesson gun to Neslund in December 1980, was subject to impeachment in light of Jenkins' friendship and business relationship with Neslund's son, Warren Daniels, and his acquaintance with Neslund herself. The court noted that the affidavit was hearsay. Subsequently the State attempted to undermine Jenkins' trial testimony regarding the gun sale to Neslund by raising a question during cross examination of Daniels, from whom Jenkins had originally bought the Smith & Wesson gun, as to whether, instead of Neslund's buying the Smith & Wesson gun in December 1980, Daniels did not in fact give his mother the Smith & Wesson gun during an earlier visit and in December 1980 did he not in fact give her a different gun. The credibility of witnesses is a jury question. *State v. Wood*, 44 Wn. App. 139, 145, 721 P.2d 541, *review denied*, 107 Wn.2d 1011 (1986). The time lapse before the gun's discovery goes to the weight of the evidence.

When the trial judge reserved his ruling on the Smith & Wesson gun's admission until the State made an offer of proof through the state criminalist's testimony regarding the blood spots on the gun, he noted that "a firearm is a pretty dramatic piece of evidence." Following the state criminalist's testimony, the gun was admitted into evidence. In ruling on the gun's admissibility, the trial court appears properly to have weighed the probative value against the potential prejudice and it cannot be said that the court abused its discretion here. *See State v. Kendrick, supra* at 628.

### Impeachment Evidence

Neslund argues that a previously suppressed sales receipt for a Colt Python gun which was dated December 18, 1980, *improperly* was admitted for the alleged purpose of impeaching the credibility of a defense witness, Neslund's son, Warren Butch Daniels, who owns a gun shop in Slidell,

Louisiana. Daniels, like Robert Jenkins, testified that his mother bought the alleged murder weapon, the Smith & Wesson gun, from Jenkins in December 1980, after the alleged murder date. The State attempted to undermine Daniels' credibility by suggesting that Neslund in fact obtained the Colt Python, not the Smith & Wesson, gun in December 1980 and that she actually obtained the Smith & Wesson gun in 1979, before the date of Rolf's alleged murder. To this end the State initially had the illegally seized transfer receipt admitted into evidence and cross-examined Daniels regarding it.[2]

Beginning with *Walder v. United States,* 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354, 355–56 (1954), an exception to the exclusionary rule has been recognized under which evidence obtained in violation of the Fourth Amendment or *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), which is inadmissible in the prosecution's case in chief or otherwise as substantive evidence of guilt, may be used to impeach the testimony of a defendant who testifies at trial.[3]

---

[2]As noted later in the text, the trial judge subsequently reversed his ruling on the handgun transfer receipt's admission.

Moreover, even before the receipt was introduced, Warren Daniels responded negatively to the following prosecution question:

Q (By Mr. Canova) Mr. Daniels, isn't it correct, that when your mother [*i.e.,* Neslund] was there in December 1980, the gun you gave her to take back to Seattle with her for her protection was in fact a Colt Python .357 Magnum, and this [Smith & Wesson] gun, this 38 caliber was one you had given her on one of her earlier visits back in '79?

A No.

[3]The exception's underlying rationale, which stresses "the importance of arriving at the truth in criminal trials, as well as the defendant's obligation to speak the truth in response to proper questions", *United States v. Havens,* 446 U.S. 620, 626, 64 L. Ed. 2d 559, 100 S. Ct. 1912, 1916 (1980) has been set forth as follows:

It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine [*Weeks v. United States,* 232 U.S. 383, 58 L. Ed. 2d 652, 34 S. Ct. 341] would be a perversion of the Fourth Amendment.

Neslund argues that the illegally seized gun transfer receipt improperly was used as substantive, not impeachment, evidence since no limiting instruction was given; however, such an instruction was not requested. "Failure to request a limiting instruction waives any error that an instruction could have corrected." *State v. Barber,* 38 Wn. App. 758, 771, 689 P.2d 1099 (1984), *review denied,* 103 Wn.2d 1013 (1985).

Relying upon *State v. Hubbard,* 103 Wn.2d 570, 693 P.2d 718 (1985) and *United States v. Hinckley,* 672 F.2d 115 (D.C. Cir. 1982), Neslund further argues that the impeachment exception to the exclusionary rule is limited to a testifying defendant himself and does not extend to defense witnesses other than the defendant. We do not reach this question for, as Neslund concedes, while the trial judge initially admitted the gun transfer receipt into evidence and permitted cross examination of Daniels regarding the Colt Python gun's transfer, he later reversed his ruling and rejected the receipt's admission. At that time the trial judge stated that he did not think that "whatever error, if there was error, [was] sufficiently prejudicial to warrant any further relief." Neslund argues that the trial judge's belated ruling excluding the gun transfer receipt did not cure any error since the cross examination testimony regarding the Colt Python gun's transfer was not stricken. However, no motion was made to strike the testimony.

■ Nevertheless, even if Neslund's failure to request that the testimony be stricken did not result in a waiver and it was error to keep the testimony before the jury, the error was harmless under either the constitutional or nonconstitutional standard. Evidence was presented to undermine both Jenkins' and Daniels' credibility. The two had a

---

. . . [T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

*Walder v. United States,* 347 U.S. 62, 65, 98 L. Ed. 503, 74 S. Ct. 354, 356 (1954), quoted in *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643, 645 (1971).

long–standing business relation and friendship and Jenkins had met Neslund before her 1980 visit with her son. Daniels' testimony that his mother never told him that she had killed Rolf was contradicted by Winnie Stafford's testimony that in her presence, Neslund admitted the deed to her son in a telephone conversation.

Moreover, the record reveals overwhelming evidence of Neslund's guilt in her confessions and admissions which were introduced into evidence through Joy Stroup, Neslund's niece; Paul Meyers, Neslund's brother; and Winnie Stafford, Neslund's friend. Thus even if the initial admission of the suppressed gun transfer receipt or the failure to exclude the testimony regarding the receipt was error, a different outcome would not have resulted absent the alleged error, given the overwhelming amount and credibility of the properly admitted evidence.[4] *State v. Guloy,* 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986); *State v. Tharp,* 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

Neslund argues that the prosecutor's closing argument made impermissible substantive use of the testimony regarding the illegally seized transfer receipt. According to her, the trial judge expressly told the prosecutor that he could argue to the jury his theory that the Colt Python, not the Smith & Wesson, was the gun that Neslund obtained in December 1980. The trial judge told the prosecutor that he could argue this theory to the jury because it was in the testimony. As noted above, no motion had been made to strike this testimony.

Further, since no objection was raised to the prosecutor's allegedly improper argument, this alleged error has not been preserved for review, *State v. Dunaway,* 109 Wn.2d 207, 221, 743 P.2d 1237 (1987), "unless the comments constitute prosecutorial misconduct so flagrant and ill intentioned that no curative instruction could have obviated the

---

[4]The propriety of admitting Neslund's confessions and admissions is discussed below.

prejudice they engendered", *State v. Kendrick*, 47 Wn. App. 620, 638, 736 P.2d 1079, *review denied*, 108 Wn.2d 1024 (1987), quoted in *State v. Dunaway, supra.* Such is not the case here.

## CORPUS DELICTI

Under the corpus delicti rule, an extrajudicial confession or admission may not be considered by the trier of fact unless independent proof prima facie establishes the corpus delicti of the crime. *Bremerton v. Corbett*, 106 Wn.2d 569, 574–75, 723 P.2d 1135 (1986). The rule's purpose is to protect the defendant from the possibility of an unjust conviction based upon a false confession alone. *Corbett*, at 576.

In a homicide case the corpus delicti requires (1) the fact of death and (2) a causal connection between the death and a criminal agency. *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967); *State v. Quillin*, 49 Wn. App. 155, 162, 741 P.2d 589 (1987). Proof of the identity of the person who committed the crime is not part of the corpus delicti. *Bremerton v. Corbett, supra* at 574. The independent proof of the corpus delicti is sufficient if it supports a logical and reasonable inference that the crime was committed by someone, and the evidence need not exclude every reasonable hypothesis consistent with the crime not having occurred. *Corbett*, at 578.

The proof may be by direct or circumstantial evidence. *State v. Lung, supra; State v. Quillin, supra.* In a case involving driving or being in actual physical control of a vehicle while intoxicated in violation of RCW 46.61.502 and .504, our State Supreme Court recently found prima facie proof of the corpus delicti as a matter of law based upon circumstantial and other evidence. *Bremerton v. Corbett, supra* at 579. Proof of the corpus delicti in that case required proof that the petitioners were driving or in actual physical control of a vehicle while intoxicated. *Corbett*, at 578. The *Corbett* court found proof of the corpus delicti in petitioner Sherrie Burkhart's case in the following facts:

[A]lthough there was no one at the scene of the single car accident when the investigating officers arrived, the evidence suggests that Burkhart and Sarber's sister were both in the car when it went over the embankment. [A witness saw a bystander help a woman with a child out of the passenger side of the car and up the embankment and return to the car to help another woman up the embankment.] In addition, the evidence will support an inference that Burkhart was the driver. She was the registered owner of the car, she was last seen driving the car earlier in the evening with Sarber's sister in the passenger seat, and Sarber's sister was unfamiliar with the area whereas Burkhart was not.

*Corbett,* at 579.

In a homicide case the body need not be produced to establish the corpus delicti. *State v. Lung, supra.* Our State Supreme Court has stated that to "require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide would be manifestly unreasonable and would lead to absurdity and injustice" since requiring that a body be produced would afford a defendant "absolute immunity if he were cunning enough to destroy the body or otherwise conceal its identity." *State v. Lung, supra* at 371.

The question here is whether evidence independent of the defendant's confessions and admissions supports a logical and reasonable inference that Rolf was dead and that his death was caused by criminal means so that the jury properly considered the defendant's confessions, along with the other evidence, in determining her guilt beyond a reasonable doubt.[5] No body was produced, and no eyewitness

---

[5]In the instant case, to avoid what the trial court termed a "bifurcated trial," the court permitted, over the defendant's objection, the State's witnesses to testify as to the defendant's confessions and admissions before it made a corpus delicti ruling at the close of the State's case. While the defendant does not argue this issue on appeal, it is noted that our State Supreme Court has stated that the trial court has the discretion to admit a confession upon the stipulation that it be corroborated by independent proof at a later time. *State v. Lung,* 70 Wn.2d 365, 372, 423 P.2d 72 (1967).

to the murder has stepped forward. Nevertheless, the physical evidence, as interpreted by expert testimony, and the circumstantial evidence support a logical and reasonable inference that Rolf died by criminal means. In addressing the sufficiency of the proof of the corpus delicti independent of the defendant's confessions, the reviewing court must assume the truth of the prosecution's evidence and all reasonable inferences therefrom in a light most favorable to the prosecution. *Bremerton v. Corbett, supra* at 571.

Here a .38 caliber Smith & Wesson handgun was found in a bureau in the defendant's master bedroom. The gun had high velocity blood spatters on the face of the cylinder head, which are consistent with the back spatter of blood from a gunshot wound to the uncovered area of the human body or an animal, shot from a distance of 3 feet or less. Robert Jenkins testified that in 1978 he had purchased that same .38 caliber gun brand new from Neslund's son, Warren Daniels, and that he had kept it in his possession at all times and used it only for target practice until he sold it to Neslund herself. No record evidence exists that the .38 caliber gun had ever been used to kill any animals.

The living room ceiling of the Neslund residence had very fine blood spatters created by a high velocity weapon and in a pattern consistent with two gunshot wounds to the head of a person situated in the area of the living room couch. Some of the blood was identified as being of human origin. In 1981 Wanda Post helped Dan Larson refinish the ceiling. The ceiling apparently was resurfaced after the blood was deposited in it, and the blood was found only in the nonresurfaced areas. Two weeks after the alleged murder date, Neslund replaced the living room couch. A trunk which was behind the couch had type A human blood and a bloody gray head hair on its lid. Rolf Neslund had type A blood and gray hair.

The presence of blood was detected on the concrete floor in the living room, in the area leading to the master bedroom, and in the master bathroom. There was evidence that the concrete had been cleaned with a strong chemical.

Crete–Nu, an etching material which can clean concrete, was found in the Neslund residence. Eight days after Rolf allegedly was murdered, the defendant purchased a carpet piece and carpet tape. In March 1981 she bought additional carpeting and tape and replaced part of the living room and bedroom carpet.

In the master bathroom blood stains, two of which were tested to be of human origin, were found on the sliding glass door frame of the bathtub and on the wallpaper near the bathtub. Blood stains were observed on the concrete floor in a path between the master bathroom and a bathroom at the other end of the house. A large stain of type A human blood was found on a carpet pad in the living room and type A human blood was found on the underside of the carpet that was in contact with the pad at this place.

Witnesses gave testimony of what appeared to be violent physical altercations between the defendant and Rolf, and of threatening statements that the defendant made in regard to Rolf. Brooks Bouillon, Jr., who worked on the Neslunds' pool in June 1980, testified that one evening when they went out to dinner, Rolf and Ruth exhibited signs of a physical argument: Rolf had a scratch and dried blood on the side of his face and Ruth had a bruise under her eye. Later that night he again saw Rolf, who had more cuts and bruises, including a deep ear cut and a cut lip.

After one fight in the fall of 1979 when Neslund had locked herself in the bunkhouse, she called her niece, Donna Smith, and told her that if Rolf came back there, she would shoot him because she was so mad at him. When Deputy Sheriff Gregory Doss responded to a call from the Neslund residence in June 1980, the tablecloth and dishes were on the dining room floor, Rolf was disheveled and had a bright red scratch along the side of his face, and the defendant, also disheveled and with a puffy face, was in the bedroom and said that she was safe there and if Rolf came in, she would shoot him. When the defendant's face was black and blue in July 1980, Rolf said that he had "decked

her," and the defendant said that Rolf would never do it again and pointed to a rifle.

In telephone conversations with her niece, Joy Stroup, between November 1979 and July 1980, Neslund said once while watching Rolf through the window that she could shoot him from right there, and also that she would "waste" him and could "burn" him. In July 1980 in the presence of her niece, Donna Smith, the defendant said in reference to Rolf something to the effect of "I won't have to put up with him any more" or "I'm going to do away with him" or "I won't have that problem much longer."

The evidence is that in about the middle of 1979, the defendant transferred most of the couple's funds, which were held as joint assets, into accounts in her individual name. The bank records and testimony of Floyd Waller, a Peoples National Bank manager, reveal that Rolf's $78,049.50 retirement funds, which were released in April 1979 to Rolf, were used to purchase a joint $50,000 money market certificate on May 1, 1979, with the balance going into a joint savings account. The money market certificate and savings account were in the names of both Rolf and Ruth. On June 25, 1979, Neslund redeemed the $50,000 money market certificate early and had a new $50,000 money market certificate issued in her name only. On the same day the entire $50,157.95 balance in the joint savings account was withdrawn and the amount deposited in a savings account at another branch in Neslund's name only. The testimony was that Neslund had a power of attorney from Rolf and had complete control over his $1,800 monthly pension checks.

On July 29, 1980, Rolf visited Kathleen Scheffler and Margaret Ronning and asked them if they owed him and the defendant money from prior transactions. When they told him "no," he said that he had no money and no funds in his checking account. Rolf wanted to revoke the power of attorney which he had given to the defendant so that he could obtain some money and asked Scheffler to assist him

in finding an attorney for that purpose. He also mentioned changing his will to provide for his sons.

On August 5, 1980, when Rolf again visited Scheffler, he told her that he was afraid of the defendant and expressed concern for his physical safety. He told her that he would return on August 12 to pick up a title report on his Lopez Island property, but except for a brief visit on August 6, Scheffler never heard from him again. On July 19, 1980, when Rolf visited Elinor Ekenes, the mother of his two sons, he told her that he wanted to change his will to provide for his sons and asked her to contact an attorney for him for that purpose. He subsequently visited her on July 29 and August 4, 1980. He indicated that he feared for his life and wanted an autopsy performed if he died.

On August 5, 1980, Rolf ordered new eyeglass lenses which he never picked up. On August 4, 1980, Rolf wrote to his brother Harald Naeslund and his wife in Norway that he was eagerly awaiting their upcoming October 1980 trip to the United States to celebrate Rolf's 80th birthday. At the time of trial Rolf's relatives in Norway had not heard from him since before his disappearance in August 1980. Upon Rolf's disappearance Gunnar Olsborg, a retired pilot friend of Rolf, contacted the sheriff's office in January 1981 and in 1981 placed advertisements in the local newspapers offering a $25,000 reward for information on Rolf's whereabouts but was unable to locate him.

The blood–tainted physical evidence which was obtained from the Neslund residence; the evidence of what appeared to be a relationship of physical violence and growing animosity between the defendant and Rolf, with the defendant's declarations regarding acts of violence toward Rolf; the defendant's transfer of the couple's funds to accounts in her individual name; Rolf's statements which indicated that he was afraid of the defendant and feared for his life; and his disappearance since August 1980 support a logical and reasonable inference that Rolf is dead and that he died by criminal means.

The instant case is similar to *People v. Scott,* 274 Cal. App. 2d 905, 79 Cal. Rptr. 587 (1969), in which the victim's body was never found. The victim's common law husband, who was the father of her daughters, was convicted of first degree murder after a bench trial. *Scott,* 79 Cal. Rptr. at 588. The court found the corpus delicti established prima facie by the following facts independent of the defendant's extrajudicial admissions. After January 1965, the victim's mother stopped receiving letters from the victim, who was close to her family, and her family never heard from her again. Several times a month a neighbor had heard the voices of the defendant and victim as if they were arguing. However, none of the neighbors ever saw the victim again after March 13, 1965. After working the second Saturday in March 1965, the victim told her employer that she would see him on Monday, but he never saw her again.

The couple's daughter saw her mother go into their home that Saturday afternoon at about 3. At 3:30 that day the defendant let his two daughters play with their mother's makeup, something that their mother had never let them do. At about midnight that night the defendant and his stepson carried a heavy and bulging closed cardboard box, which was 3 feet by 3 feet by 3½ feet in size, from the bedroom into their station wagon, and the defendant and the children then drove to an area where the defendant and his stepson buried the box in a 4-foot-deep hole about 30 feet from a creek. The following weekend or so, the defendant sold the victim's clothes and also his stepson's .22 caliber rifle which the stepson had bought about 2 weeks before March 13. A sheet from a March 1965 calendar showing markings near the number "13" was found in the defendant's possession in 1967. *Scott,* 79 Cal. Rptr. at 589–90.

Similarly to *Scott,* here the defendant and her husband had a history of violent arguments, and Rolf's relatives and friends did not hear from him again after August 1980 although Rolf had told Kathleen Scheffler specifically that he would see her on August 12, 1980, and on August 4 he

had written to his brother and his wife in anticipation of their visit in a couple of months. While no large box or other evidence of a body is present in the instant case, blood stains were found on the living room ceiling in a pattern consistent with two gunshot wounds to the uncovered area of a human body or animal, on the concrete floor under the carpet pad, on the wallpaper and parts of the shower door rail in the master bathroom, and on the lid of a trunk which was behind the living room couch, and some of the blood stains were identified as being of type A blood, which was Rolf's blood type.

In March 1982 a gun owned by the defendant was found in a bureau of the defendant's master bedroom, and the gun had blood spatters on the face of the cylinder head consistent with the close–range shooting of the uncovered area of a human body or animal. Not long after the alleged murder date, the defendant replaced the living room couch and part of the living room carpet and cleaned part of the residence's concrete floor with an etching material. As in *Scott,* the facts present in the instant case establish prima facie the corpus delicti independent of the defendant's extrajudicial confessions and admissions.

## ADOPTIVE ADMISSION

Neslund next contends that the trial court erred in admitting portions of her brother Paul Meyers' testimony recounting conversations he overheard between Neslund and their brother Robert Meyers.[6] The substance of the conversations was Robert's graphic account of how Rolf Neslund was killed, butchered with a broadax, burned in a barrel, and his ashes disposed of behind the barn. The trial court permitted the testimony as an "adoptive admission" by silence pursuant to ER 801(d)(2)(ii). On appeal, Neslund argues that there was an insufficient evidentiary foundation to establish that she heard or understood Robert's allegedly

---

[6]We are not concerned here with Neslund's direct statements to Paul Meyers that she had killed Rolf.

incriminating comments and that, consequently, her silence cannot be construed as acquiescence.

ER 801(d)(2)(ii) provides that an admission by a party-opponent is not hearsay if it is offered against a party and is "a statement of which he has manifested his adoption or belief in its truth . . ." Adoption of ER 801(d)(2)(ii) did not substantially change the long-standing law in Washington that

> when a statement is made in the presence and hearing of an accused that is accusatory or incriminating in character, and such statement is not denied, contradicted, or objected to by him, both the statement and fact of his failure to deny, contradict, or object are admissible [in] a criminal trial as evidence of his acquiescence in its truth.

*State v. Redwine,* 23 Wn.2d 467, 470, 161 P.2d 205 (1945), *overruled on other grounds in State v. Robinson,* 24 Wn.2d 909, 917, 167 P.2d 986 (1946). Unlike pre-rule decisions, which treated admissions by party-opponents as exceptions to the hearsay rule, ER 801(d)(2) now excludes them from the definition of hearsay altogether. *See* Comment, ER 801.

A party-opponent may manifest adoption of a statement in words or gestures. *See, e.g., State v. Lounsbery,* 74 Wn.2d 659, 445 P.2d 1017 (1968) (defendant in indecent liberties case failed to deny accusation, visited psychologist as required by victim's mother, and complained he was being persecuted for "one mistake"); *State v. Studebaker,* 67 Wn.2d 980, 410 P.2d 913 (1966) (inference of admission of guilt raised by defendant's lack of indignation and his answers when father of indecent liberties victim told defendant to stay out of town); *State v. Anderson,* 44 Wn. App. 644, 723 P.2d 464 (1986), (defendant manifested adoption of statement by nodding head "yes"), *review dismissed,* 109 Wn.2d 1015 (1987).

A party can also manifest adoption of a statement by complete silence. *See, e.g., State v. Pisauro,* 14 Wn. App. 217, 540 P.2d 447 (1975) (admission by silence when witness asked whether guns offered for sale were stolen and defendant failed to reply); *State v. Goodwin,* 119 Wash.

135, 204 P. 769 (1922) (statement by victim of explosion that defendant "did it" was type of accusation to which innocent person would reply). Because of the inherently equivocal nature of silence, however, such evidence must be received with caution. *State v. Baruth,* 47 Wash. 283, 292, 91 P. 977 (1907).

Silence constitutes an admission only if (1) the party–opponent heard the accusatory or incriminating statement and was mentally and physically able to respond; and (2) the statement and circumstances were such that it is reasonable to conclude the party–opponent would have responded had there been no intention to acquiesce. *See State v. Goodwin, supra* at 140–41; *State v. Baruth, supra;* R. Aronson, *Evidence in Washington* § VIII, at 20 (1986); 5A K. Tegland, Wash. Prac., *Evidence* § 348 (2d ed. 1982).

■ Appellate courts in this state have not explicated specific foundational requirements for adoptive admissions by silence. Federal courts, however, construing the identically worded federal rule, require a preliminary determination by the trial court that there are sufficient foundational facts from which the jury reasonably could conclude that the defendant actually heard, understood, and acquiesced in the statement. *United States v. Moore,* 522 F.2d 1068, 1076 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049 (1976); *United States v. Sears,* 663 F.2d 896, 904 (9th Cir. 1981), *cert. denied sub nom. Werner v. United States,* 455 U.S. 1027 (1982). The circumstances must also be such that "an innocent defendant would normally be induced to respond." *United States v. Sears, supra; see also United States v. Giese,* 597 F.2d 1170, 1196 (9th Cir.), *cert. denied,* 444 U.S. 979 (1979).

The trial court's decision is only a threshold determination; the jury is primarily responsible for determining "whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement." *United States v. Moore, supra* at 1075. Whether an accused has made an adoptive admission is

thus a matter of conditional relevance to be determined ultimately by the jury.[7] *United States v. Barletta,* 652 F.2d 218 (1st Cir. 1981); *see also* ER 104(b); 5 K. Tegland §§ 19, 20.

In the instant case, the trial court followed the federal approach. Prior to ruling, the trial court listened to Paul Meyers' proposed testimony outside the jury's presence. The trial court then found that the overheard statements were incriminating, made within Neslund's presence and hearing, and were of a kind "to which an innocent person in the situation of the defendant would reply."

Neslund maintains that there is no evidence from which to infer that she heard or understood Robert's alleged remarks and that her silence therefore cannot imply acquiescence. As the appellant notes, Paul Meyers was unable to specify the date on which the conversations occurred, and he could not attribute any statement to a particular speaker. He was unsure of the number of conversations and whether a friend had been present in addition to Neslund and Robert. Meyers also acknowledged that he was "pretty

---

[7]The trial court's role in such situations was analyzed in *United States v. Barletta,* 652 F.2d 218, 219 (1st Cir. 1981):

> The court's role in ruling on the admissibility of evidence generally suggests that it should rule on the basis of its own factual assessment. But the "adoption" question comes within a special subclass of preliminary questions, those which present precisely the same question as an ultimate issue of fact in the case, which we think demands a different standard: to preserve the proper allocation of responsibilities between judges and juries, such questions ought to be decided by the latter. Thus the court's role in these instances is not to make a factual determination, but rather to rule as a matter of law whether a reasonable jury could properly find the ultimate fact in favor of the proponent of the evidence. Indeed, to hold otherwise—to deny the jury the possibility of making a particular factfinding simply because the court would determine the fact otherwise—might in criminal cases deprive a defendant of his Sixth Amendment right to have his case tried to a jury. Read in this light, then, we think the "preliminary" question to be decided by the court under [Federal] Rule 104(a) is properly understood in such instances to be the question of law whether a reasonable jury could find a particular fact. In this case [adoptive *admission*], the precise question to be asked is whether a jury could find the fact in the government's favor by a preponderance of the evidence.

(Citations omitted.) *Barletta,* at 219–20.

damn drunk" at the time and that Neslund and Robert were probably also drinking heavily.

Meyers related, however, that he overheard the conversation from an adjoining bedroom with the door open and that he "could hear plain the talk from the bar . . ." Even though Meyers could not attribute any specific part of the incriminating conversation to either Neslund or Robert, he stated several times that *both* Neslund and Robert participated and that Neslund never denied any of the statements.

Meyers' testimony that he heard Neslund and Robert participate in a detailed conversation describing the killing of Rolf Neslund and the dismemberment and disposal of his body was sufficient to support a finding that Neslund heard and understood the incriminating statements and that she had the ability to, but did not, deny the account. *Cf. United States v. McKinney,* 707 F.2d 381 (9th Cir. 1983) (evidence insufficient to introduce statement as adoptive admission when court could not determine whether defendant heard the statement or if circumstances were such that he could be expected to respond to statement). The graphic account was also of such a nature that it would be reasonable to conclude, given the informal and noncustodial atmosphere, that an innocent person would have responded had there been no intention to acquiesce. *See United States v. Giese, supra* at 1196. Because Meyers' testimony satisfied the foundational·requirements, the evidence was properly admitted. Any weaknesses in Meyers' account, including evidence of intoxication, went to the weight, not the admissibility, of his testimony on this issue, and he was extensively cross–examined on the subject of intoxication and its effects on his memory. *See United States v. Giese, supra* at 1196 n.28.

### RIGHT TO CONFRONTATION

Neslund next argues that even if Paul Meyers' testimony about the overheard conversations was correctly admitted pursuant to ER 801(d)(2)(ii) as adoptive admissions, the

evidence nonetheless violated Neslund's confrontation rights. A confrontation error is of constitutional magnitude and may be raised for the first time on appeal. *State v. Hieb,* 107 Wn.2d 97, 108, 727 P.2d 239 (1986). While the rule against hearsay and the confrontation clause generally protect similar values, "the overlap is not complete." *United States v. Inadi,* 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121, 1126 n.5 (1986). Thus, either ground may support an objection irrespective of whether the evidence is precluded by the other. *See State v. Anderson,* 107 Wn.2d 745, 749–50, 733 P.2d 517 (1987); *California v. Green,* 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970); 5A K. Tegland § 355, at 183–84.

Although this issue has been raised infrequently, there is general agreement that adoptive admissions of the defendant do not implicate the right of confrontation. Some courts have concluded that confrontation concerns do not arise because an adoptive admission is essentially the defendant's own incriminating statement. Other courts have focused on the statements that are adopted, reasoning that such statements are not admitted as substantive proof of the matter asserted and that, consequently, no purpose would be served by cross examination of the declarant.

█ Adoptive admissions are, by their very nature, attributed to the defendant, even though couched in the words of a third person. It is the defendant's response to the incriminating statement that "makes it evidence." *See Wilson v. Pine Bluff,* 6 Ark. App. 286, 641 S.W.2d 33, 37, *review denied,* 643 S.W.2d 569 (1982); *State v. Lounsbery, supra* (incriminating evidence is defendant's reaction to accusations). Constitutional confrontation rights are not implicated by the admission of the defendant's own incriminating out–of–court statements. *See State v. Harris,* 106 Wn.2d 784, 792, 725 P.2d 975 (1986), *cert. denied,* 107 S. Ct. 1592 (1987); *see also Wilson v. Pine Bluff, supra; Poole v. Perini,* 659 F.2d 730, 733 (6th Cir. 1981) ("An adoptive confession avoids the confrontation problem because the words of the hearsay become the words of the defendant."),

*cert. denied,* 455 U.S. 910 (1982). When a defendant has adopted a statement, its reliability no longer depends on the veracity and demeanor of a third person not in court. *See State v. Greer,* 202 Kan. 212, 447 P.2d 837 (1968). As one commentator has observed, the lack of opportunity to cross–examine the declarant in situations involving admissions

> is deprived of significance by the incongruity of the party objecting to his own statement on the ground that he was not subject to cross–examination by himself at the time.

M. Graham, *Federal Evidence* § 801.15 Commentary, at 756 (2d ed. 1986), quoted in *United States v. McKinney, supra* at 387 n.4 (Belloni, J., dissenting).

The right of confrontation serves ultimately to test the truth of the witness' testimony. *See State v. Fullen,* 7 Wn. App. 369, 380, 499 P.2d 893 (quoting *California v. Green,* 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970)), *review denied,* 81 Wn.2d 1006 (1972), *cert. denied,* 411 U.S. 985 (1973). Generally this purpose would not be furthered by cross examination of the declarant whose statements are adopted because such statements are not admitted as substantive evidence of the truth of the matter asserted. *See United States v. Giese, supra* at 1195.

Adoptive admissions necessarily require admission of the statements to which the defendant is deemed to acquiesce. "Both the question or statement and the answer or comment in reply come in since the acknowledgment by the defendant adopts the accusation as his admission." *State v. Fullen, supra* at 378–79. The declarant's accusatory or incriminating statements are not admitted as substantive proof of the matters asserted, but rather "merely to lay the foundation for a showing of [the defendant's] failure to deny them." *United States v. Giese, supra.* Under these circumstances, the statements do not constitute hearsay under traditional principles. *See* ER 801(c); *see also Tennessee v. Street,* 471 U.S. 409, 413, 85 L. Ed. 2d 425, 105 S. Ct. 2078 (1985) (accomplice's confession introduced to

rebut defendant's testimony was not admitted as substantive evidence and thus was not hearsay). Absent the contextual information provided by the triggering accusation, an adoptive admission generally would be unintelligible to the jury.

When out–of–court assertions are used for nonhearsay purposes, no confrontation clause concerns arise. *See, e.g., Tennessee v. Street, supra; State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982) (confrontation problems arise only when out–of–court statement offered for truth of its content) (citing *Dutton v. Evans,* 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970)); *State v. Carter,* 23 Wn. App. 297, 300, 596 P.2d 1354, *review denied,* 92 Wn.2d 1035 (1979). Neslund's confrontation rights here were adequately protected by Paul Meyers' presence on the stand. The State's witness against Neslund was Paul Meyers, not Robert Meyers. *Cf. Tennessee v. Street, supra* at 414.

In *State v. Fullen, supra,* we rejected a confrontation challenge to an adoptive admission. Although the admission in *Fullen* involved the defendant's "unequivocal" *oral* acquiescence in an incriminating statement, the court's analysis of the relationship between the accusation and the admission is equally applicable to adoptive admissions by silence and does not depend on the manner in which the defendant adopted the statement:

> The accusation would not have been admissible standing alone, but the defendant made it his own. Thus it was a part of a whole confession of the defendant admissible as an exception to the hearsay rule. The source of the accusation was immaterial, only the reaction thereto being probative. Had the defendant been presented a stone tablet with the accusation thereon or had [the declarant] been dead at the time of defendant's trial would have made no difference. His adoption of the words as his own made them proper for consideration. The accusation was not offered as an assertion of the truth of the matters *asserted therein but to* show what the defendant meant by his reply. Thus it was not hearsay and did not depend upon the credibility of the out–of–court asserter for its value. . . . [T]herefore no purpose would be served by

[the declarant's] cross–examination or confrontation by the defendant.

*Fullen,* at 379.[8]

In summary, because the adoptive admissions here are deemed to be Neslund's own statements and because Robert Meyers' statements were not admitted to prove the truth of the matter asserted, Neslund's confrontation rights were not violated. *See, e.g., United States v. Giese, supra* at 1195; *Wilson v. Pine Bluff, supra; State v. Buckner,* 223 Kan. 138, 574 P.2d 918 (1977); *see also United States v. McKinney, supra* at 387 (Belloni, J., dissenting). *But cf. United States v. Monks,* 774 F.2d 945, 952 (9th Cir. 1985).[9]

### SUFFICIENCY OF THE EVIDENCE

■ The specific question presented is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the premeditation element of first degree murder[10] beyond a reasonable

---

[8]Neslund relies primarily on *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976) for the proposition that adoptive admissions are subject to confrontation claims. In *Boast,* a witness testified to overhearing three men discussing a robbery. The trial court admitted the testimony implicating the defendant as an adoptive admission by silence. Our Supreme Court upheld admission of the evidence in the face of a confrontation challenge. *Boast,* at 454.

Although the court prefaced its analysis with an observation that seems to support Neslund's contention, *Boast,* at 452–53, it proceeded to the confrontation question without considering the nature of adoptive admissions or their relationship to hearsay. Research has disclosed no subsequent decision that has construed *Boast* in the broad manner urged by the appellant.

[9]In *United States v. Monks,* 774 F.2d 945, 952 (9th Cir. 1985), the court concluded that adoptive admissions do not always satisfy confrontation requirements, "at least where the third–party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant." Unlike the instant case, however, in *Monks* the adoptive admissions involved incriminating statements made by a nontestifying codefendant in a joint trial. The court determined that under the circumstances the declarant's statements had "probative value beyond the fact that the adopter may have adopted the statements", therefore implicating the confrontation clause. *United States v. Monks, supra.*

[10]RCW 9A.32.030(1)(a) defines first degree murder:
"(1) A person is guilty of murder in the first degree when:

doubt. *State v. Bingham,* 105 Wn.2d 820, 823, 719 P.2d 109 (1986). Premeditation must involve more than a moment in point of time, RCW 9A.32.020(1), and is defined as

> "the deliberate formation of and reflection upon the intent to take a human life", and involves "the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short."

(Citation omitted.) *State v. Ollens,* 107 Wn.2d 848, 850, 733 P.2d 984 (1987). Premeditation can be proven by circumstantial evidence where the "inferences drawn by the jury are reasonable and the evidence supporting the jury's findings is substantial." *State v. Luoma,* 88 Wn.2d 28, 33, 558 P.2d 756 (1977); *accord, State v. Bingham, supra* at 824.

In *State v. Bingham, supra* at 822, 826, 828, our State Supreme Court held that the mere passage of time for the killing to occur, in that case the approximately 3 to 5 minutes it took for the killing by manual strangulation, shows only an opportunity to deliberate and by itself is insufficient to sustain the premeditation element absent evidence that the defendant did in fact deliberate. Subsequently, in distinguishing the case before it from *State v. Bingham* and *Austin v. United States,* 382 F.2d 129 (D.C. Cir. 1967), which is quoted in *Bingham,* our State Supreme Court quoted from *Austin v. United States, supra,* as follows:

> [T]he Government was not able to show any motive for the crime or any prior threats or quarrels between appellant and deceased which might support an inference of premeditation and deliberation. Thus the jury could only speculate and surmise, without any basis in the testimony or evidence, that appellant acted with premeditation and deliberation.

*State v. Ollens, supra* at 852–53 (quoting *Austin,* at 139).

The *Ollens* court distinguished *Austin* on the basis that in *Ollens,* unlike in *Austin,* there was a possible motive— that Ollens killed the victim to effectuate the robbery.

---

"(a) With a premeditated intent to cause the death of another person, he causes the death of such person . . ."

*Ollens,* at 853. *Ollens* distinguishes *State v. Bingham* on grounds that unlike in *Bingham,* sufficient evidence of premeditation existed in *Ollens* to submit to a jury the question of whether Ollens killed with premeditation. First, the slashing of the victim's throat following the multiple stabbing indicated that the defendant premeditated on his already formed intent to kill. Second, unlike in *Bingham,* the procurement of a weapon was involved since a knife was used in the killing. Third, a jury could find from the evidence that the victim was attacked from behind, indicating premeditation. Last, evidence of a motive removed this question from the realm of jury speculation or surmise. *State v. Ollens, supra.*

The instant case similarly is distinguishable from *State v. Bingham* in that the evidence here of prior threats and quarrels, a motive to kill and the procurement of a weapon is sufficient for a rational fact finder to have found premeditation beyond a reasonable doubt. *State v. Ollens, supra.*

First, unlike in *Bingham,* here ample evidence was presented of a stormy relation between the defendant and the victim which erupted in violent physical confrontations and threats by the defendant that she would shoot Rolf or "waste," "burn," or "do away" with him. Shortly before his death Rolf communicated to Kathleen Scheffler and to Elinor Ekenes that he was afraid of the defendant and feared for his life and wanted an autopsy performed if he died.

Second, the fact of a long marital relation between the defendant and victim and evidence of a possible motive to kill distinguish the instant case from *Bingham,* in which the defendant and victim were strangers and no evidence of a motive was introduced. *State v. Giffing,* 45 Wn. App. 369, 375, 725 P.2d 445, *review denied,* 107 Wn.2d 1015 (1986); *see State v. Ollens, supra.* The defendant had handled the couple's finances exclusively during their marriage. As their marriage began to deteriorate upon Rolf's retirement, the defendant transferred the couple's joint assets into bank accounts in her name only. Shortly before he died Rolf had

no money and was trying to ascertain what the defendant had done with the money. The testimony of Paul Meyers, the defendant's brother, was that Robert Meyers, another brother, said in Neslund's presence that the reason that Rolf was shot was that he told the defendant to "put the money back or else." According to Robert, Rolf got the "or else." Thus there exists a possible motive—that Rolf was killed so that the defendant would not have to relinquish the money. *See State v. Ollens, supra.*

Finally, unlike in *Bingham,* in which the procurement of a weapon played no part, here, according to the testimony of the prosecution witnesses, a gun was used in the killing. *State v. Ollens, supra.* While Neslund argues that no evidence exists that she went to obtain a gun to shoot Rolf, the evidence indicates that Rolf was shot at close range with a gun and that the defendant's guns were kept in the master bedroom, not on her person, so that a reasonable inference from the evidence is that while Robert held Rolf, the defendant went to get a gun and then shot Rolf twice in the head. Moreover, like the evidence of an attack on the victim from behind, which was found to indicate premeditation in *State v. Giffing, supra,* and *State v. Ollens, supra,* here the testimony that Robert held Rolf while the defendant shot him indicates deliberation and premeditation.

Neslund argues that the only evidence of her threatened use of force against Rolf was conditioned upon her using force in self-defense; however, the testimony does not support a self-defense claim. In the fatal confrontation, the fact that Robert held Rolf while the defendant shot him negates such a claim. An assertion of self-defense based upon Winnifred Stafford's statement that the defendant told her that she shot Rolf because "[i]t was either a matter of she shot him or he would shoot her" is undercut by Stafford's subsequent clarification that "[t]here was a worry that there was a gun of Rolf's someplace." When the evidence is viewed in the light most favorable to the prosecution, sufficient evidence exists from which a rational fact

finder could have found beyond a reasonable doubt that the defendant deliberately formed and reflected upon the intent to kill Rolf. *State v. Ollens, supra* at 850, 853.

### PROSECUTORIAL MISCONDUCT

No record exists of the trial court's alleged in–chambers ruling on the permissible scope of the State's direct examination of Winnifred Stafford regarding her telephone conversation with defense counsel M. Fred Weedon. Therefore, pursuant to *State v. Miller*, 40 Wn. App. 483, 488, 698 P.2d 1123, *review denied*, 104 Wn.2d 1010 (1985), Neslund's appellate counsel obtained from the trial attorneys and the trial judge affidavits which were filed in the Court of Appeals. The affidavits indicate that no trial court ruling was made as to this matter although the prosecutor's affidavit reveals his agreement to refrain from asking Stafford about that portion of the telephone conversation wherein Weedon advised Stafford to "lie low and hopefully the prosecution would not find out about her change in testimony until it was too late."

Neslund concedes that the prosecutor's direct examination questioning of Stafford was within proper bounds. Nevertheless, she claims that in closing argument the prosecutor improperly made the italicized statement here:

> She [Stafford] leaves for California, taking a friend of hers down to Arizona, driving her down as she had been asked to do the year before.
> She gets down there and is staying with her family outside San Diego. She gets a call from some friends saying that Fred [the defense counsel] wants to talk to her.
> So she calls Fred, tells him in response to his questions that she can't testify. She's perjured herself in front of the inquiry judge when she said she didn't kill Rolf. Fred tells her, "Fine. We won't be calling you as a witness, in that case. *Enjoy your vacation.*"

(Italics ours).

In determining whether a prosecutor's comments denied the defendant a fair trial, the reviewing court must decide whether the comments are in fact improper and, if

so, whether a substantial likelihood exists that the comments affected the jury. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Failing to request a curative instruction or to object to a prosecutor's allegedly improper remark constitutes a waiver of the error unless the statement is deemed to be so flagrant and ill intentioned that the resulting prejudice could not have been neutralized by a jury admonition. *State v. Dunaway,* 109 Wn.2d 207, 221, 743 P.2d 1237 (1987).

Neslund argues that the "enjoy your vacation" remark should have been excluded because it is not supported by the record and is highly prejudicial. The State concedes that the remark is unsupported by Stafford's testimony and was "clearly a mistake" on the prosecutor's part. The State points out, however, that no objection was raised, nor was a curative instruction requested. Neslund agrees that the statement was inadvertent and was not intended to impugn defense counsel's integrity.

Nevertheless, citing *Bruno v. Rushen,* 721 F.2d 1193 (9th Cir. 1983), *cert. denied,* 469 U.S. 920 (1984), Neslund argues that the prosecutor's remark unfairly permitted the jury to nurture suspicions about defense counsel's integrity so that she was denied the effective representation of counsel required by the constitution. However, *Bruno* is distinguishable in that in *Bruno* the prosecutor's opening and closing argument accusations of witness tampering by defense counsel and his closing argument attack upon defense counsel's integrity were found to be extensive and calculated, unlike the prosecutor's statement here, which was brief and, as Neslund concedes, inadvertent.

Relying upon *State v. Jackson,* 83 Wash. 514, 145 P. 470 (1915), Neslund further argues that the prosecutor's statement violated her constitutional privilege against self–incrimination in that the statement permitted the jury to penalize the defendant for her counsel's failure to notify the State of Stafford's incriminating testimony although the defendant has a constitutional right not to notify the prosecutor of such evidence. In *Jackson,* the prosecutor, in

the jury's presence and over defense counsel's objections, demanded of a defense witness the production of allegedly incriminating documents which had not been produced prior to trial, and our State Supreme Court, finding the defendants' constitutional rights violated, granted a new trial in part on this ground. In the instant case, by contrast, there was no such flagrant prosecutorial impropriety.

Here even assuming that the prosecutor's comment implicated the defendant's constitutional rights so that the constitutional harmless error standard applies, the remark did not prejudice the defense. *See State v. Traweek,* 43 Wn. App. 99, 108, 715 P.2d 1148, *review denied,* 106 Wn.2d 1007 (1986). The circumstantial evidence, physical evidence, expert testimony and particularly the defendant's confessions and admissions provided overwhelming evidence of her guilt. *State v. Guloy,* 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986); *State v. Traweek, supra.* Moreover, any prejudicial effect of the inadvertent remark was offset by jury instruction 1, which admonished the jury to disregard any statement of counsel which was not supported by the evidence and to permit no prejudice to influence its deliberations. In light of the remark's brevity and indirectness, if the alleged error was of a constitutional magnitude, it was harmless beyond a reasonable doubt. *State v. Traweek, supra.*

### EVIDENCE OF SHOOTING AT ANIMALS

Citing *State v. Rupe,* 101 Wn.2d 664, 706–07, 683 P.2d 571 (1984), Neslund argues that admitting evidence of her shooting at animals violated her state constitutional right to possess weapons, requiring reversal of her conviction. Const. art. 1, § 24 provides:

> The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

*Rupe,* at 706.

*Rupe,* at 703, found the admission during the sentencing proceeding of evidence concerning the defendant's gun collection to be irrelevant, prejudicial, and violative of due process. The *Rupe* court, at pages 706–07, reversed Rupe's death sentence, holding that due process was violated by permitting a jury to draw adverse inferences from the exercise of the state constitutional right to possess weapons. *State v. Hancock,* 109 Wn.2d 760, 767, 748 P.2d 611 (1988).

In the instant case the State argues that *Rupe* is distinguishable in that here the testimony dealt not with Neslund's mere possession of firearms but with her experience with, and ability to use, firearms. Further, according to the State, unlike in *Rupe,* where several weapons were admitted into evidence, here the firearms found in Neslund's residence upon the search warrant's execution were not admitted into evidence, with the exception of the alleged murder weapon.

The *Rupe* court noted that it did not decide the parameters of the state constitutional right to possess weapons since Rupe's behavior, the possession of legal weapons, fell squarely within the bounds of the right guaranteed by Const. art. 1, § 24. *State v. Rupe, supra.* The court thus concluded that under our state constitution Rupe was entitled to possess weapons "without incurring the risk that the State would subsequently use the *mere fact of possession* against him in a criminal trial *unrelated to their use."* (Italics ours.) *Rupe,* at 707.

In the instant case when the prosecutor attempted to question a witness as to "whether or not Mrs. Neslund had any firearms," the court sustained a defense objection raised on relevance grounds. However, the court did permit, over a defense objection, testimony related to whether Neslund knew how to shoot a firearm. Without objection, testimony was admitted that Neslund had shot a prairie hen on a bird hunting trip, had shot at a deer from the front door of her home, and from the sun room outside the house had shot a cat that was preying on quail in the yard.

*Rupe* is not controlling here in that the challenged evidence is not of the mere possession of weapons unrelated to their use but rather is evidence of the defendant's familiarity with and ability to use a firearm. *State v. Rupe, supra.* Moreover, even constitutionally protected materials may be admissible if the evidence is relevant. *State v. Hancock, supra; State v. Kendrick,* 47 Wn. App. 620, 627, 736 P.2d 1079, *review denied,* 108 Wn.2d 1024 (1987). Since the State alleged that Neslund had shot and killed her husband, evidence of her experience with, and capability of using, a firearm was relevant. This is a second basis on which *Rupe* is distinguishable.

*State v. Rupe, supra* at 708, found no relation between the fact that the defendant collected guns and the issue of whether he deserved the death sentence; moreover, it found the evidence to be prejudicial since personal reactions to gun ownership varied greatly and some individuals might believe that the defendant was a dangerous individual and thus deserved the death penalty simply because he owned guns. *State v. Hancock,* at 767–68. In the instant case evidence of Neslund's ability to use a firearm was probative of a key issue as to whether she had shot Rolf, and since any prejudice was outweighed by the probative value of the evidence, it was within the trial court's discretion to admit the evidence. *State v. Kendrick, supra* at 627–28.

In any event, Neslund's claims of irrelevance and prejudice were waived by the lack of timely and specific trial objections. *State v. Guloy,* 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). Objections on relevance grounds were raised only to specific questions regarding the distance from which the animals were shot, not the fact that the defendant had shot an animal.

## NEW TRIAL MOTION

The trial court denied Neslund's new trial motion brought, *inter alia,* on grounds of newly discovered evidence of Winnifred Stafford's alleged mental instability.

Neslund now contends that the trial court abused its discretion in failing to render a presentencing ruling on Stafford's competency to testify at trial since the State would have suffered no prejudice from a few weeks' sentencing delay to permit a psychiatric evaluation of Stafford. The State responds that the trial court did not abuse its discretion in denying Neslund's new trial motion based upon Stafford's mental condition. The denial or granting of a new trial motion will be undisturbed on appeal absent an abuse of discretion. *State v. Crowell,* 92 Wn.2d 143, 145, 594 P.2d 905 (1979).

A witness' testimonial competency is to be determined by the trial court within the framework of RCW 5.60.050 and CrR 6.12(c), and the court's competency determination will not be reversed on appeal except for an abuse of discretion. *State v. Froehlich,* 96 Wn.2d 301, 304, 635 P.2d 127 (1981). We find no abuse of discretion in the denial of the new trial motion based upon Stafford's mental condition.

As the State asserts, no evidence was presented that Stafford was incompetent to testify at the time of trial, and no objection as to her competency was raised at any stage of the trial, although defense counsel had communicated with Stafford several times during the 3 months preceding trial, had conducted an extensive interview of Stafford before her trial testimony as a State rebuttal witness, and had subjected her to vigorous cross examination at trial. The trial judge, who was in the best position to evaluate Stafford's competency at trial, did not believe that a new trial or a continuance of sentencing was warranted based upon his observation of Stafford during her trial testimony and the showing of her alleged mental infirmity presented in support of the new trial motion. We cannot say that the trial court abused its discretion. The cases relied upon by Neslund are distinguishable in that unlike here, they involved situations where the witness competency question arose either before trial or during trial or retrial. Even if in

special circumstances a witness' incompetency to testify at trial may be shown after trial, that showing has not been made here.

Affirmed.

WILLIAMS and GROSSE, JJ., concur.

Review denied by Supreme Court May 4, 1988.