# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48244-4-II |
| Respondent, | |
| v. | |
| WILLIAM JASON GRISSO, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. - William Jason Grisso appeals his conviction for first degree murder for killing Nancy Gardner, arguing that (1) the State failed to prove the premeditation element of his conviction; (2) the prosecutor mischaracterized the jury's role and minimized the State's burden of proof; (3) the trial court gave an improper jury instruction; and (4) appellate costs should not be awarded to the State if this appeal is unsuccessful. We affirm.

FACTS

A. THE MURDER

Grisso and Gardner met online in December 2013. They met in person for the first time at the San Antonio airport on February 12, 2014, at which time Grisso proposed marriage. Grisso helped Gardner move to Washington in late April and early May 2014. Gardner and Grisso began living together in Lakebay, Washington. Around the same time, Grisso purchased a subcompact

Smith and Wesson 9 millimeter handgun and a Sig Sauer 9 millimeter handgun from Nagel's Gun Shop, and sent pictures of the two guns in their respective boxes to Gardner.

The following month, in June 2014, Grisso reconnected with a girlfriend, Carolynne Rapier, whom he had previously lived with, by sending her a message on Facebook. Grisso and Rapier had lived together until September 2013, at which time Grisso had told Rapier and her children to leave his house. In the Facebook message, Grisso sought to apologize and reconcile their relationship. The two began exchanging text messages frequently and met to discuss resuming their relationship. On June 29, Grisso spent the day bowling and going to the beach with Rapier and her children. Grisso did not tell Rapier about Gardner.

When he was with Rapier, Grisso changed Gardner's name in his phone to a pseudonym to keep his relationship with Gardner hidden in the event Gardner called. Similarly, Grisso changed Rapier's name in his phone to a pseudonym to hide the relationship from Gardner. At all relevant times in this case, Grisso was also married to woman named Carrie Evans.

Throughout the day on June 30, Grisso told Rapier through text messages that he was going to be in Sequim playing music with a band until late into the night. He also told her that he loved her.

Grisso did not tell Rapier about Gardner until a little after 4 P.M. on June 30, when Rapier asked Grisso about Gardner's Facebook posts referencing "Bill," "Lakebay," and being engaged. Verbatim Report of Proceedings (VRP) (Sept. 23, 2015) at 548. Grisso told Rapier that Gardner was just a "one-date stalker." At 4:28 P.M., Grisso sent a text message to Rapier saying, "I am not losing you again," and then invited Rapier to come to his house in Lakebay when he returned from

2

playing music late that night. VRP (Sept. 23, 2015) at 550. At 4:38 P.M., Grisso told Rapier he had arrived at his destination and had to set up. At 5:11 P.M., Grisso called Rapier and told her he was about to lose cell service. He sent another text message to Rapier at 5:44 P.M. telling her, "I love you a lot." VRP (Sept. 23, 2015) at 553. He would later tell law enforcement that during this time he was in Lakebay looking for Gardner, but the cell phone signal from his phone call to Rapier used the tower nearest the state park where Gardner's body was subsequently found.

Just after 6 P.M. on June 30th, Grisso called law enforcement to make a missing person report, claiming Gardner was missing. Grisso stated that Gardner had left her phone at the house and that the phone had stayed exclusively in his possession since he had returned home between 3:00 and 3:30 P.M. and noticed she was missing. Grisso also told the responding law enforcement that he and Gardner were dating, the two were living together, and that he had found a message on her phone stating that she was heading out of town. However, Grisso later told law enforcement that he and Gardner were no longer dating and that he wanted Gardner out of his house, but that Gardner had told him that she was not willing to leave and would leave when she was ready.

A box for a Smith and Wesson handgun was located at the home, but the gun was missing. When asked by law enforcement about the empty Smith and Wesson box, Grisso told law enforcement that Gardner had taken the gun with her. Law enforcement wrote down the serial number from the box in the house for the Smith and Wesson handgun Grisso said Gardner took with her.

The same day he reported Gardner missing, Grisso moved Gardner's car and some of her other belongings to the house of a friend of his, Kimberly Desoto. At that time, Grisso expressed

3

an interest in trading Gardner's car to Desoto in exchange for one of Desoto's vehicles, going so far as to even leave the title to Gardner's car with Desoto.

The day after reporting Gardner missing, Grisso changed Rapier's name in his phone to her real name and moved in with Rapier. Grisso also posted eviction notices on the home he had shared with Gardner and placed all of her belongings in a shed after boxing them up.

On July 5th, Grisso did an internet search on his phone for a woman's body found on Elfendahl Pass Road, which was the road by the state park where Gardner's remains would be found four days later. He made similar searches over the next couple of days.

On July 9th, Rapier's apartment was searched by law enforcement just after Grisso exited the apartment and was arrested. In that search, a Smith and Wesson 9 millimeter handgun was located. The serial number of the recovered weapon matched the serial number of the Smith and Wesson that Grisso claimed Gardner had taken with her.

Law enforcement executed a search warrant on Grisso's truck as well. A plastic box that Grisso's Sig Sauer 9 millimeter handgun came in was recovered, along with an ammunition magazine. But the Sig Sauer 9 millimeter handgun was not found.

Law enforcement viewed some pictures that were taken by Gardner's phone. There were several pictures on the phone that were taken on June 30th, the latest of which was taken at 4:58 P.M., which was after Grisso told law enforcement he had returned home to find Gardner gone but her phone was still there.

Law enforcement extracted the latitude and longitude coordinates that were embedded in the pictures. When the coordinates embedded in the picture from 4:58 P.M. were recovered, the

law enforcement officers who were searching Grisso's home in Lakebay were directed to proceed to the location designated by the coordinates. The location coordinates were in a forested state park near Belfair, Washington. It took the law enforcement officers approximately an hour to drive from Grisso's home in Lakebay to the parking lot of the state park. The coordinates embedded in the picture from 4:58 P.M. led law enforcement to within 50 feet of where Gardner's remains were found. Gardner's remains were found in a brushy area of the forested state park on July 9th.

Near Gardner's remains, law enforcement found two bullet casings on the ground and two bullets in the ground. Forensic analysis was conducted on the bullet casings and bullets found near Gardner's body. The forensic analysis showed that the two bullet casings were 9 millimeter casings and the two bullets that were found by Gardner's body were consistent with the type of bullets that would be set on a 9 millimeter casing. The analysis further showed that the markings on the bullet casings made clear that they could not have been fired from the Smith and Wesson that was recovered from Grisso. The grooves on the bullets were consistent with having been fired from a Sig Sauer.

B.      The TRIAL

At trial, Officer Lincoln Hales, Detective John Jimenez, Detective-Sergeant Brian Lund, Verizon Wireless court analyst Martha Haecherl, Detective Gary Sanders, Carolynne Rapier, Detective Lynelle Anderson, forensic investigator Mary Lou Hanson-O'Brien, forensic investigator Robert Scott Creek, Detective Ryan Salmon, Deputy Tristin Marrs, Detective Mike Hayes, forensic scientist Brenda Walsh, and forensic scientist William Dean testified to the above

facts. In addition, the medical examiner testified that Gardner suffered two gunshot wounds to the head. One bullet traveled from near her left ear through the top of her head; this wound would have been fatal. The other traveled between her face and the base of her skull; this would have been life-threatening but was not necessarily an absolutely fatal wound.

At the end of trial, the trial court gave the following jury instruction:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of the crime charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Clerk's Papers (CP) at 44 (Jury Instruction No. 2).

During closing arguments, the prosecutor argued:

> Now, you all know from being in Court that the burden of proof is on the people. You may have already known that from watching movies. The burden of proof is on the people. We have to prove every element of the crime beyond a reasonable doubt. Not every fact of the case, but every element of the crime.
>
> And I am going to give you a way to look at that concept, the evidence and the lack of evidence and how to weigh all of that.
>
> So let's say you have a jigsaw puzzle, and let's say you get some pieces of the puzzle, you get some evidence, but it's not enough pieces. It's not enough evidence to know beyond a reasonable doubt what the picture portrays.

And then you get some more pieces and some more evidence, and it's still not enough for you to have an abiding belief in the truth of what the picture portrays.

And then you get some more pieces, and you get some more evidence. And at some point, you've seen enough. You have enough evidence. You've seen enough pieces of the puzzle to know beyond a reasonable doubt what the picture portrays. You have an abiding belief in the truth that that is a picture of the Tacoma Dome.

What is significant about this is that you don't need every single possible piece of evidence. There can be some unanswered questions. There can be some pieces that aren't there for you.

For example, in this case, the crime is not on videotape. There are no eyewitnesses. But what you do have is enough pieces of the puzzle, enough evidence to know what happened here, to have an abiding belief in the truth of what happened here.

So the last thing I am going to ask you is to return the only verdict that reflects the truth of what happened, the only verdict that is just for Nancy Gardner, for her family and for our community. Thank you.

VRP (Oct. 7, 2015) at 1146-47. The defense objected to the prosecution's jigsaw analogy as quantifying the State's burden of proof. The trial court overruled the objection.

The jury found Grisso guilty of first degree murder. The jury also found by special verdict that Grisso and Gardner were members of the same family or household and that Grisso was armed with a firearm at the time he committed the crime. Grisso appeals.

ANALYSIS

A.    PREMEDITATION ELEMENT IN FIRST DEGREE MURDER

Grisso argues that the State failed to prove the element of premeditation in his conviction for first degree murder. We hold that sufficient evidence was presented such that, after viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the element of premeditation was proven beyond a reasonable doubt.

First degree murder is proscribed in Washington by RCW 9A.32.030, and requires premeditation as one of its essential elements.[1] The jury in Grisso's trial was properly instructed that, "A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." CP at 49 (Jury Instruction No. 7). Specifically, the jury was instructed that:

> To convict the defendant of the crime of murder in the first degree; each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 30th day of June, 2014, the defendant acted with intent to cause the death of Nancy Gardner;
>
> (2) That the intent to cause the death was premeditated;
>
> (3) That Nancy Gardner died as a result of the defendant's acts; and
>
> (4) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 52 (Jury Instruction No. 10).

---

[1] Specifically, RCW 9A.32.030(1)(a) states that a person is guilty of first degree murder when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person."

"The test for reviewing a defendant's challenge to the sufficiency of evidence in a criminal case is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 596–97, 888 P.2d 1105 (1995), *cert. denied*, 516 U.S. 843 (1995)). "All reasonable inferences from the evidence are drawn in favor of the State," and the element of premeditation may be proven with circumstantial evidence "where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial." *Id.* Credibility determinations are left for the trier of fact and cannot be reviewed on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Grisso challenges that there was insufficient evidence for the jury to have found the element of premeditation. For a finding of premeditation, the evidence must show "'the deliberate formation of and reflection upon the intent to take a human life,'" which "involves 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *Pirtle*, 127 Wn.2d at 644 (quoting *Gentry*, 125 Wn.2d at 597-98). Four characteristics are particularly relevant in establishing premeditation; those characteristics are: "motive, procurement of a weapon, stealth, and the method of killing." *Id.*

Reviewing the evidence presented at trial, the State presented sufficient evidence such that any rational trier of fact could have found the element of premeditation had been proven beyond a reasonable doubt. Sufficient evidence of motive, procurement of a weapon, stealth employed, and the method used to kill Gardner was presented.

1.      Motive

The State presented evidence that Grisso's motive to kill Gardner was to enable him to pursue a relationship with Rapier. The evidence presented to support that Grisso had motive included Grisso being engaged to and living with Gardner while going on dates with Rapier; Grisso expressing his love for Rapier and how he was not losing her again; Grisso telling Gardner to leave the house and her refusing; Grisso lying to Rapier about who Gardner was; Grisso hiding his relationship with Gardner from Rapier; Grisso hiding his relationship with Rapier from Gardner; Grisso using pseudonyms for Rapier and Gardner in his phone to hide his relationship from both and ceasing that practice the day after he reported Gardner missing; Grisso inviting Rapier to come to his home later that night before he killed Gardner; and Grisso moving in with Rapier the day after he reported Gardner missing. Viewing this evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found that Grisso had motive to kill Gardner beyond a reasonable doubt. *Id.* at 643.

2.      Procurement of a Weapon

The State presented evidence that Grisso procured a weapon to kill Gardner. In *State v. Ollens*, 107 Wn.2d 848, 853, 733 P.2d 984 (1987), our Supreme Court held that the use of a weapon to kill another was sufficient to show procurement of a weapon. *See also State v. Neslund*, 50 Wn. App. 531, 560, 749 P.2d 725 (1988) (holding that procurement of a weapon was established by evidence that a gun was used in the killing despite no evidence that the gun was originally obtained for the purpose of shooting the victim).

Here, the evidence showed that a gun was used to kill Gardner. Gardner was killed by two 9 millimeter bullets. The evidence also showed that Grisso had purchased two 9 millimeter handguns from Nagel's Gun Shop—a Smith and Wesson and a Sig Sauer. The box for the Sig Sauer, along with ammunition and magazines for the gun, were found in Grisso's truck, but the gun itself was never found. Grisso told law enforcement that Gardner took the Smith and Wesson with her, but that Smith and Wesson was later located at the apartment where Grisso was arrested. Viewing this evidence in the light most favorable to the prosecution, we hold that because any rational trier of fact could have found beyond a reasonable doubt that Gardner was killed with a gun that Grisso had procured, sufficient evidence supports the procurement of a weapon.

3.      Stealth

The State presented evidence that Grisso tried to commit the murder without being caught. The evidence showed that Grisso reported Gardner as a missing person to law enforcement; Grisso told law enforcement that he had found a message on her phone saying that she was leaving town; and Grisso told law enforcement and Rapier conflicting stories about his whereabouts on June 30th, and both of those stories conflicted with the evidence of his movements obtained through his cell phone usage that day. The evidence further showed that Gardner's remains were found in a secluded and brushy area of a forested state park about an hour from Grisso's home, where pictures where taken on her phone after the time Grisso claimed he was home and in possession of Gardner's phone. Moreover, Grisso's Sig Sauer 9 millimeter handgun was identified as the likely murder weapon and was never located, but the box and ammunition for the gun was found in Grisso's truck. Viewing this evidence in the light most favorable to the prosecution, we hold that

11

any rational trier of fact could have found beyond a reasonable doubt that Grisso tried to conceal the murder of Gardner. *Id.*

4.    Method of Killing

The State presented evidence that Gardner was killed in a secluded and brushy area of a forested state park by two 9 millimeter gunshot wounds to her head. Searches made on Grisso's phone, before Gardner's remains were found, sought information regarding a woman's body being found near the road that passes by the state park. Next to where Gardner's remains were found in the state park were two 9 millimeter bullet casings, and lodged in the ground were two 9 millimeter bullets. The medical examiner's examination of her remains showed she suffered two bullet wounds to the head—one that entered by her left ear an exited through the top of her head, and a second that passed between her face and the base of her skull. The markings on the bullet casings showed they could not have been fired from the Smith and Wesson 9 millimeter handgun, and the grooves on the bullets were consistent with having been fired from a Sig Sauer 9 millimeter handgun. Viewing this evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found beyond a reasonable doubt that Gardner was killed by two 9 millimeter bullet wounds to her head, fired from a Sig Sauer handgun, in a secluded state park. *Id.*

5.    Conclusion: Sufficient Evidence Supported a Finding of Premeditation

Sufficient evidence was presented regarding Grisso's actions that demonstrated each of the four characteristics considered particularly relevant in establishing the element of premeditation— "motive, procurement of a weapon, stealth, and the method of killing." *Id.* at 644. Therefore, we

hold that sufficient evidence was presented such that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the element of premeditation was proven beyond a reasonable doubt. *Id.* at 643.

B.     PROSECUTORIAL MISCONDUCT

Grisso argues the prosecutor committed misconduct by mischaracterizing the role of the jury, appealing to jury's passion and prejudice, and minimizing the State's burden of proof. Specifically, Grisso argues that the prosecutor's request that the jury return "the only verdict that reflects the truth of what happened" and "the only verdict that is just . . . for our community," mischaracterized the jury's role and appealed to their passion and prejudice. VRP (Oct. 7, 2015) at 1147; Br. of Appellant at 15. And Grisso argues that the prosecutor's jigsaw puzzle analogy quantified and minimalized the State's burden of proof. We hold that Grisso's prosecutorial misconduct arguments fail.

1.     Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). First, we determine whether the prosecutor's conduct was improper. *Id.* at 759. If the prosecutor's conduct was improper, the question turns to whether the prosecutor's improper conduct resulted in prejudice. *Id.* at 760–61. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.* at 760.

If a defendant does not object at trial, he or she is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. *Id.* at 760–61. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In making a prejudice determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762.

In closing argument, prosecutors are afforded wide latitude to draw and express reasonable inferences from the evidence. *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203, *review denied*, 176 Wn.2d 1009 (2012). Prosecutors may not rely on facts outside the evidence or use arguments calculated to inflame the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012); *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). We do not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). We presume the jury follows the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

2.      The Jury's Role and Appealing to its Passion and Prejudice

Grisso argues that the prosecutor's request that the jury return "the only verdict that reflects the truth of what happened" and "the only verdict that is just . . . for our community," mischaracterized the jury's role and appealed to their passion and prejudice. VRP (Oct. 7, 2015) at 1147; Br. of Appellant at 15. Grisso's argument is that it was misconduct for the prosecutor to ask the jury to return a verdict reflecting the truth because that is not the State's constitutional burden, and it was misconduct for the prosecutor to ask the jury to return the only verdict that is just for the community because that argument appeals to the jury's passion and prejudice by charging it with protecting the community. We hold that Grisso's assertions of prosecutorial misconduct for mischaracterizing the role of the jury and appealing to the jury's passion and prejudice fail.

Counsel did not object to the prosecutor's argument. Therefore, Grisso is deemed to have waived any error unless he is able to show that the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. *Emery*, 174 Wn.2d at 760–61. Relying on *Emery*, Grisso contends that the argument was flagrant and ill-intentioned because "there was long-standing precedent prohibiting prosecutors from urging the jury to seek the truth, from appealing to the jury's emotions, and from asking the jury to protect the community." Br. of Appellant at 17.

Even if we assume without deciding that the prosecutor's argument that the jury return "the only verdict that reflects the truth of what happened," was sufficiently similar to the prosecutor's improper argument in *Emery* that the jury's verdict "declare" or "speak the truth," Grisso's

argument fails. Grisso fails to show (1) how a curative instruction reminding the jury of its proper role would not have obviated any prejudicial effect on the jury, and (2) how the argument "resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). Grisso's argument with respect to the prosecutor's request in this case that the jury return a just verdict for the community fails for the same reason.

The only argument Grisso makes regarding prejudice for his claims of prosecutorial misconduct here is that the evidence presented on the element of premeditation "was far from overwhelming." Br. of Appellant at 16. However, as explained in Section A, *supra*, any rational trier of fact could have found the element of premeditation beyond a reasonable doubt from the evidence presented.

As to motive, the State presented evidence showing Grisso was engaged to and living with Gardner while going on dates with Rapier; Grisso told Rapier he loved her and would not lose her again; Grisso told Gardner to leave the house and she refused; Grisso lied to Rapier about who Gardner was; Grisso hid his relationship with Gardner from Rapier; Grisso hid his relationship with Rapier from Gardner; Grisso invited Rapier to his home before he killed Gardner; Grisso stopped using pseudonyms for Rapier and Gardner in his phone the day after reporting Gardner missing; and Grisso moved in with Rapier the day after he reported Gardner missing. As to procurement of a weapon, the State presented evidence showing Gardner was killed by two 9 millimeter bullet wounds to her head, Grisso purchased a Sig Sauer 9 millimeter handgun that was never found, and Grisso had the Sig Sauer box, ammunition, and magazines in his truck. As to

stealth, the State presented evidence that Grisso attempted to conceal his crime by showing that he filed a missing person report; he provided conflicting stories of his activities on June 30th; Gardner was found in a secluded and brushy area of a forested state park; and Grisso's Sig Sauer 9 millimeter handgun was never found. Finally, as to the method of killing, the State presented evidence that Gardner was killed by two 9 millimeter bullet wounds to the head in a secluded and brushy area of a forested state park.

With this evidence presented to the jury, Grisso's assertion that the evidence of premeditation "was far from overwhelming" is not persuasive. Moreover, it fails to address how a curative instruction regarding the jury's proper role would not have obviated any prejudice and fails to address how the prosecutor's arguments resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Emery*, 174 Wn.2d at 761. Therefore, we hold that Grisso's assertions of prosecutorial misconduct for mischaracterizing the role of the jury and appealing to the jury's passion and prejudice fail.

3.  Jigsaw Analogy

Grisso argues the prosecutor's jigsaw analogy quantified and minimalized the State's burden of proof. We hold that this court's holding in *State v. Fuller*, 169 Wn. App. 797, 282 P.3d 126 (2012), controls and the argument was not improper.

In *Fuller*, we considered the following argument made in the prosecution's closing:

> What I am going to do now is use a jigsaw puzzle to illustrate the concept of beyond a reasonable doubt. . . . We get a few of the pieces of the puzzle. . . . [W]e might think it looks like Tacoma, but we don't know—
>
> . . . .

17

. . . [W]e do not have enough pieces of enough evidence beyond a reasonable doubt that it's [a picture] of Tacoma.  But let's say we get some more pieces. . . .  But we may not yet have enough pieces, enough evidence to know beyond a reasonable doubt that it's Tacoma.

Now, we have more pieces.  We have more evidence and we can see beyond a reasonable doubt that this is a picture of Tacoma. . . .

A trial is very much like a jigsaw puzzle.  It's not like a mystery novel or CSI or a movie.  You're not going to have every loose end tied up and every question answer[ed].  What matters is this:  Do you have enough pieces of the puzzle?  Do you have enough evidence to believe beyond a reasonable doubt that the defendant is guilty?

169 Wn. App. at 827 (quoting the record).

In *Fuller*, we held the jigsaw puzzle analogy was not improper because "the State neither equated its burden of proof to making an everyday choice nor quantified the level of certainty necessary to satisfy the beyond a reasonable doubt standard."  169 Wn. App. at 827.  Moreover, we pointed out, "[T]he State accurately stated that it had to prove every element of the crime charged and further referenced the trial court's actual instruction on beyond a reasonable doubt." *Id.*

Similarly, here, the prosecution's analogy to a jigsaw puzzle did not equate its burden of proof to anything nor did it quantify the level of certainty necessary to satisfy the beyond a reasonable doubt standard.  Grisso argues that the State "communicated to the jury that it could lack exactly 16.6% of the necessary information and still find guilt beyond a reasonable doubt" because the State used a slide during the argument that showed five out of six jigsaw pieces in place over a picture of Tacoma.  Br. of Appellant at 20.  This argument is unavailing because the slide used in Grisso's trial is the same slide that was used in *Fuller*.  Moreover, here, immediately

before using the jigsaw puzzle analogy, the State accurately stated that it had the burden of proof and that its burden was "to prove every element of the crime beyond a reasonable doubt." VRP (Oct. 7, 2015) at 1146. Therefore, we hold that Grisso's prosecutorial argument regarding the prosecutor's jigsaw puzzle analogy fails.

C.      REASONABLE DOUBT JURY INSTRUCTION

Grisso argues that the trial court gave an improper jury instruction. Specifically, Grisso assigns error to jury instruction 2, arguing that it violated his due process rights because the abiding "belief in the truth of the charge" language "impermissibly encouraged the jury to undertake a search for the truth." Br. of Appellant at 21.

The jury instruction Grisso challenges has been expressly approved of by our Supreme Court in *State v. Bennett*, 161 Wn.2d 303, 306, 165 P.3d 1241 (2007). Also, the same argument Grisso makes here has been rejected in *State v. Jenson*, 194 Wn. App. 900, 901, 378 P.3d 270 (2016) (rejecting the argument that the reasonable doubt instruction focused the jury on a "search for the truth"). Therefore, we hold that the trial court did not err in using it to instruct the jury in this case.

D.      APPELLATE COSTS

Grisso requests that this court decline to impose appellate costs against him if the State prevails on this appeal. We will not consider an award of appellate costs at this juncture.

Under *State v. Grant*, 196 Wn. App. 644, 385 P.3d 184, (2016), a defendant is not required to address appellate costs in his or her briefing to preserve the ability to object to the imposition of costs after the State files a cost bill. A commissioner of this court can consider whether to award

appellate costs in due course under the newly revised provisions of RAP 14.2 if the State decides to file a cost bill and if Grisso objects to that cost bill.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Bjorgen, C.J.

Melnick, J.